# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **ANIKA WARNER, ET AL.,** | * | **CIVIL NO.:  2:18-cv-01435-JDC-KK** |
| | * | **(LEAD)** |
| | * | |
| **VERSUS** | * | **JUDGE JAMES D. CAIN, JR.** |
| | * | |
| | * | **MAG. JUDGE KATHLEEN KAY** |
| **TALOS ERT, LLC, ET AL.** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### PLAINTIFFS ANIKA WARNER AND VANTRECE JACKSON'S
### OPPOSITION TO DEFENDANT TALOS ERT, LLC'S
### <u>MOTION TO EXCLUDE THE TESTIMONY OF EDWARD ZIEGLER</u>

J. Kyle Findley (#34922)
kfindley@arnolditkin.com
John G. Grinnan (*Pro Hac Vice* granted)
jgrinnan@arnolditkin.com
**ARNOLD & ITKIN LLP**
6009 Memorial Drive
Houston, TX 77007
Telephone: 713-222-3800
Facsimile: 713-222-3850
e-service@arnolditkin.com

-AND-

Michael Cox (# 22026)
mike.cox@coxcoxfilo.com
COX, COX, FILO, CAMEL & WILSON LLC
723 Broad Street
Lake Charles, LA 70601
Tel: 337.436.6611
Fax: 337.436.9541

**ATTORNEYS FOR ANIKA WARNER**

Zachary P. McFarlane (#38832)
zmcfarlane@zehllaw.com
Michael E. Streich
mstreich@zehllaw.com
**ZEHL & ASSOCIATES, PC**
2700 Post Oak Blvd., Suite 1000
Houston, TX 77056
Telephone: 713.491.6064
Facsimile: 713.583.1492

**ATTORNEYS    FOR    VANTRECE
JACKSON**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………....…...........iii

I.   INTRODUCTION AND BACKGROUND…..…………………………………………………1

    A.   Edward Ziegler's resume—which Talos does not challenge—shows that
        he is qualified to testify in this case……………………………….………..……..…2

    B.   Mr. Ziegler's opinions on Talos' failures are supported by record evidence…...…..3

        1.   Talos failed to ensure the overall safety of the platform…………………….3

        2.   Talos failed to issue a proper JSA for the pipe-removal operation,
            dooming it from the start………………………………………………………...5

        3.   Talos failed to proper supervise DLS and intervene when an
            alleged deviation from Talos' plan occurred…...………………...………..8

        4.   Talos's failures precipitated the parting of the rope and
            Mr. Jackson's presence in the landing zone…………………….……..…4

II.  LAW AND ARGUMENT……………………………………………………………....…..12

    A.   The Court has considerable discretion in admitting expert testimony; and the
        exclusion of an expert's opinions is the exception rather than the rule……...…….12

    B.   Contrary to Talos' manufactured theories, Mr. Ziegler's opinions do not
        constitute impermissible legal conclusions; the motion should be denied……......12

    C.   Mr. Ziegler's testimony is not repetitive or cumulative………………………….18

        1.   The plaintiffs' experts opined and testified from different vantage
            points; their opinions and testimony are not cumulative…………………19

        2.   Testimony of the plaintiffs' experts is not cumulative;
            it is corroborative………………………………………………………20

III. CONCLUSION………………………………………………………………...20

## **TABLE OF AUTHORITIES**

**Cases**

*Alford v. Anadarko E&P Onshore LLC,*
    2015 WL 471596 (E.D. La. 2015)…………………………………...………………15

*Asbury v. MNT, Inc.,*
    2013 WL 12143046, at *1 (D.N.M. 2013)…………………………………..………..14

*Burst v. Shell Oil Co.,*
    120 F. Supp. 3d 547 (E.D. La. 2015)……………………….……………………………17

*Campbell v. Keystone Aerial Survs., Inc.,*
    138 F.3d 996 (5th Cir. 1998)……………………………………………………………15

*Comardelle v. Sears, Roebuck & Co.,*
    1996 WL 63100 (E.D. La. 1996)………………………………………………………15

*Cooper/T. Smith Stevedoring Co., Inc. v. Bright Navigation, Inc.,*
    2019 WL 12528990 (E.D. La. 2019)…………………………………..…………..13

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993)…………………………………………………...…12-14, 17

*Deville v. Conmaco/Rector, L.P.,*
    2011 WL 13213666 (E.D. La. 2011)……………………………...………………15

*Dinett v. Lakeside Hosp.,*
    2000-2682 (La. App. 4 Cir. 2/20/02), 811 So. 2d 116…………………………………...17

*Gantt v. Seadrill Americas, Inc.,*
    360 F. Supp. 3d 402 (E.D. La. 2018)…………………………………………………15

*Gilbreath v. Winkleski,*
    476 F. Supp. 3d 804 (W.D. Wis. 2020)……………………………………......…18, 20

*Howard v. Offshore Liftboats, LLC,*
    2016 WL 9444450 (E.D. La. 2016)…………………………….....……………….…14

*Jones v. Buck Kreihs Marine Repair, L.L.C.,*
    2013-0083 (La. App. 4 Cir. 8/21/13), 122 So. 3d 1181………………………………15

*Keener v. Mid-Continent Cas.,*
    01-1357 (La. App. 5 Cir. 4/30/02), 817 So. 2d 347…………………………………......17

iii

*Leefe v. Air Logistics, Inc.*,
    876 F.2d 409 (5th Cir. 1989)………………………………………………………18

*Lumpkin v. Keaton Transp. Servs., Inc.*,
    2005 WL 6737600 (E.D. Tex. 2005)………………………………………...………14

*Manchack v. Willamette Indus., Inc.*,
    621 So. 2d 649 (La. App. 2 Cir. 1993)……………………………………………14-15

*McAdams v. Louisiana Power & Light Co.*,
    95-126 (La. App. 5 Cir. 7/25/95), 659 So. 2d 820…………………………….......14-15

*McElgunn v. CUNA Mut. Grp.*,
    2009 WL 1578489 (D.S.D. 2009)………………..…………………………………...15

*Mobil Expl. & Producing v. A-Z/Grant Int'l Co.*,
    1996 WL 194931 (E.D. La. 1996)………………………………………………...14, 16

*Moore v. Ashland Chem. Inc.*,
    151 F.3d 269 (5th Cir. 1998) …………………………………………………....17

*Mosley v. Atchison*,
    689 F.3d 838 (7th Cir. 2012)………………………………………………......18, 20

*Parker v. John W. Stone Oil Distributors, L.L.C.*,
    2019 WL 3891574 (E.D. La. 2019)………………………………………………18-20

*Patriot Contracting, LLC v. Star Ins. Co.*,
    2018 WL 10797881 (E.D. 2018)………………………………………………...…...15

*Ponds v. Force Corp.*,
    2016 WL 7178483 (E.D. La. 2016)……………………………………………….15-16

*Prejean v. Satellite Country, Inc.*,
    474 F. Supp. 3d 829 (W.D. La. 2020)…………………………………………....…13

*Raynor v. Merrell Pharms. Inc.*,
    104 F.3d 1371 (D.C. Cir. 1997) ……………………………………………..…....17

*Richardson v. SEACOR Lifeboats, LLC*,
    2015 WL 2193907 (E.D. La. 2015)……………………………...............13-15

*Rodriguez v. Riddell Sports, Inc.*,
    242 F.3d 567 (5th Cir. 2001) ………………….…………..………………………14

*Romero v. Mobil Expl. & Producing N. Am., Inc.,*
    939 F.2d 307 (5th Cir. 1991)……………………………………………………………………14

*Ross v. Willard,*
    2007 WL 4374027 (M.D. La. 2007)……………………………………………………………16

*Shawler v. Ergon Asphalt & Emulsions, Inc.,*
    2016 WL 1019121 (E.D. La. 2016)………………………………………………….........15

*Shell Offshore, Inc. v. Tesla Offshore, L.L.C.,*
    2015 WL 5714622 (E.D. La. 2015)…………………………………………………….....16

*Smith v. Ford Motor Co.,*
    215 F.3d 713 (7th Cir. 2000) ………………………………………………………….....17

*Stewart v. Quality Carriers, Inc.,*
    2021 WL 2708924 (M.D.L.A. 2021)……………………………………………....12-13

*Tajonera v. Black Elk Energy Offshore Operations, L.L.C.,*
    2016 WL 9414347 (E.D. La. 2016)………………………………………………....…..16

*Thomas v. W&T Offshore, Inc.,*
    2018 WL 4223589 (E.D. La. 2018)……………………………………………………12, 14

*Waters v. Lowe's Home Centers, LLC,*
    2019 WL 5309969 (E.D. La. 2019)……………………………………………………15

*White v. C F Indus., Inc.,*
    411 So. 2d 511 (La. App. 1 Cir. 1982)………………………………………………....15

*Williams v. Union Pac. R. Co.,*
    1992 WL 395285 (E.D. La. 1992)………………………………………...…………15

*Woods v. Seadrill Americas, Inc.,*
    2017 WL 8293244 (E.D. La. 2017)…………………………………………….....15

*United States v. Kizeart,*
    102 F.3d 320 (7th Cir. 1996)………………………………………………………20

*United States v. Vickers,*
    442 F. App'x 79, 84 (5th Cir. 2011)………………………………….......18, 20

*Viterbo v. Dow Chem. Co.,*
    826 F.2d 420 (5th Cir. 1987)………………………………………………………17

**PLAINTIFFS ANIKA WARNER AND VANTRECE JACKSON'S
OPPOSITION TO DEFENDANT TALOS ERT, LLC'S
MOTION TO EXCLUDE THE TESTIMONY OF EDWARD ZIEGLER**

The plaintiffs, Anika Warner and Vantrece Jackson, oppose the motion to exclude the testimony of Edward Ziegler filed by Talos ERT, LLC ("Talos").[1]

**I.    INTRODUCTION AND BACKGROUND**

This Court is familiar with the facts of this case. Talos hired DLS, LLC and its crew, including Mr. Walter Jackson, to remove useless and heavily corroded firewater piping on its WC 215-A offshore platform ("the platform"). Mr. Jackson was killed in the process. Talos devised and approved a step-by-step procedure for the pipe-removal operation and required DLS workers to follow it. Briefly, this procedure required DLS to torch-cut the corroded firewater pipes into sections and, using a half-inch manila rope, lower it to a deck below which was not properly barricaded. But during the lowering down of a pre-cut pipe, the manila rope parted—causing the pipe to fall and strike Mr. Jackson in the head.

This suit against Talos, the sole owner and operator of the platform, ensued. Discovery revealed that Talos not only knew of the pipe-falling hazard, but directly created it through its negligent practices as well as violations of BSEE regulations and its own safety policies and procedures. Yet, despite overwhelming evidence of its negligence, Talos denies any liability for Mr. Jackson's death. Hiding behind a contractual "independent contractor" label, Talos claims that it never owed any duty to Mr. Jackson.[2]

In an effort to prevent any contrary evidence on the point from ever reaching the jury, Talos has filed three recycled motions seeking to exclude the opinions of all three of the plaintiffs'

---

[1]    Rec. Doc. 106, Talos' motion to exclude Edward Ziegler.

[2]    Rec. Doc. 93, Talos' motion for summary judgment seeking dismissal of all claims.

liability experts.[3] This motion asking the Court to strike the testimony of Edward Ziegler is the latest attempt. But like the ones before it, the attempt is hollow and should be rejected by the Court.

### A.    Edward Ziegler's resume—which Talos does not challenge—shows that he is qualified to testify in this case.

As a preliminary matter, Talos does not dispute Mr. Ziegler's qualifications. Having amassed 45-plus years of experience in the offshore/onshore oil and gas, well abandonment, cranes/rigging, and safety industries,[4] Mr. Ziegler is immensely qualified to testify in this case. In addition, what will make Mr. Ziegler's testimony particularly helpful and valuable to the jury is the fact that he also (1) has personally worked offshore on fixed platforms, where he acted and was trained on how to act as a Person in Charge ("PIC") and an Ultimate Work Authority ("UWA")[5]—the very position that carries responsibilities implicated in this case, and (2) has personally written programs for and issued and evaluated documents such as hot work permits and Job Safety Analysis ("JSA")—which are also directly at issue here.[6]

Unable to find any flaw in his qualifications, Talos gas turned—not even to Mr. Ziegler's methodology for reaching his opinions—but to the bases and conclusions of his opinions. In its scattershot motion, Talos goes to great lengths in an effort to undermine Mr. Ziegler's opinions. But the effort is futile because each of Mr. Ziegler's conclusions is based on an overwhelming body of documentary evidence in this case. These points, together with Talos' unfounded objections, will be discussed in turn.

---

[3]    Rec. Doc. 103, Talos' motion to exclude Martin Gee; Rec. Doc. 105, Talos' motion to exclude Rex Anderson; Rec. Doc. 106, Talos' motion to exclude Edward Ziegler.

[4]    Exhibit 1, Edward Ziegler's report, p. 6.

[5]    *Id.* at p. 4.

[6]    *Id.* at p. 5.

**B.     Mr. Ziegler's opinions on Talos' failures are supported by record evidence.**

Talos has asked the Court to exclude Mr. Ziegler's testimony on the sole ground that it finds his opinions to be unfavorable. Specifically, Talos argues that Mr. Ziegler erred in concluding that (1) Talos was responsible for safety on its platform, (2) Talos failed to identify and then eliminate the pipe-falling hazard, (3) Talos was required to supervise DLS and intervene if a deviation from Talos' job plan happened to occur, and (4) Talos' failure to provide the adequate tools for the job and to barricade the landing zone precipitated Mr. Jackson's death. But the evidence knee-caps Talos' argument.

**1.     Talos failed to ensure the overall safety on the platform.**

*First,* Talos faults Mr. Ziegler for concluding that Talos' PIC, Jeremy Bourque, was responsible for the overall safety on Talos' platform and for ensuring that incidents—like the one at issue here—are avoided.[7] But this is not just Mr. Ziegler's mere opinion. It is also the testimony of Talos' own corporate representative, Richard Spinks. And it is the testimony of Talos' director of compliance, Steve Champagne.

Both Mr. Spinks and Mr. Champagne testified that Mr. Bourque was the PIC and UWA on Talos' platform at the time of Mr. Jackson's death.[8] Mr. Spinks and Mr. Champagne also testified

---

[7]      Rec. Doc. 106-1, Talos' memorandum in support, pp. 13-14 of 19.

[8]      Exhibit 2, Talos corporate deposition, pp. 70:6-71:20 ("Q: . . . And so WC-215, at and around the time of this incident, would have had somebody or some people assigned to it that would have been either independently the UWA and/or PIC or would have been at the same time the UWA or the PIC, fair? A: Correct. A: And do you know if it was one individual or two individuals as it relates to WC-215 on -- in February 17th, 2018? A: February 17th, 2018, that is correct, it was one individual. Q: Okay. So what we had on WC-215 at the time of Mr. Jackson's death is we had one person who was acting both as the UWA and the PIC, fair? A: Fair. Q: And is it my understanding that that was Mr. Bourque? A: That is correct. Q: And so just so we're clear, on February 17th, 2018, Mr. Bourque was the ultimate work authority for WC-215 but he was also the person in charge for WC-218, fair? A: Fair. Q: Said another way, Mr. Bourque had the authority and the position to make final decisions relating to all activities and operations aboard the WC-215, fair? . . . A: Yes. Q: Mr. Bourque was responsible for the overall safety of the facility and -- and initiating emergency response, fair? . . . A: Correct. Q: And then Mr. Bourque would also be responsible for

that, by virtue of being entrusted with these titles, Mr. Bourque was responsible for (1) the "overall

safety" on the platform,[9] (2) supervising, making final decisions, and acting as "ultimate authority"

for the entire pipe-removal operation,[10] and (3) ensuring safety of everyone involved in it.[11]

---

the different duties and responsibilities, as we're going to get into and as contained in this document, as it relates to the UWA responsibilities but also as it relates to PIC responsibilities, fair? . . . A: Correct.") (form objections omitted). *See also* Exhibit 4, Deposition of Steve Champagne, pp. 270:24-279:91 and pp. 301:2-303:14 ("Q: Now, we talked about Mr. Bourque on the date of the incident was the individual with ultimate work authority, right? A: He was. Q: And the work that the DLS employees were doing were SIMOPS [simultaneous operations] activities, true? A: They were. Q: Now, what was -- can you please as a former Talos operations manager explain to me what Mr. Bourque's responsibility was for making  final decisions related to specific SIMOPS activities? . . . A: If he saw something questionable during the -- during the planning stage or during the execution stage, it would be his -- his questioning of the activity, possibly stopping the activity, editing the activity, changing it, whatever. Q: . . . All right. He had the final say as to how that work was conducted if he wanted to, true? . . . A: Not just if he wanted to, if he saw something being done unsafely. Q: Well, any unsafely in a way he didn't want it to be done, his authority was the final decision related to specific SIMOPS activities, true? . . . A: That's what it says, final decisions, yes. . . . Q: . . . My question is different. It's, if he wanted to change the way a supervisor was -- of the contractor performing the work, Mr. Bourque, as a UWA, had the final decision-making authority related to SIMOPS activities, true? . . . A: Yes. . . . Q: If the PIC notices something that he wants changed, he has the final decision-making authority to change it, true? . . . A: Yes, that's true.") (form objections omitted) (cleaned up).

[9]     *Id. See also* Exhibit 4, Deposition of Steve Champagne, p. 275:5-21 ("Q: Okay. Now, I want to go down a little bit to where it says 'person in charge.' We've used PIC or person in charge today. I want to make sure I understand it. This document says, 'The production representative in charge of production operations on an OCS facility. The PIC is responsible for overall safety of the facility and initiating emergency response procedures.' Do you see that? A: Yes. Q: Is that consistent with your understanding of the definition of a PIC? A: Correct. Q: What is your understanding of the PIC's responsibility to -- for overall safety of the facility? A: Be in charge of anything that is production related. He's in charge of safety associated with production operations.").

[10]    Exhibit 4, Deposition of Steve Champagne, pp. 128:4 -129:22("Q: . . . What is your understanding of the person who has oversight on a platform? . . . A: The PIC or ultimate work authority. Q: Okay. It's the person who is in charge and serves in a supervisory capacity, right? . . . A: Yes. Q: Okay. That would be the person who ultimately controls what goes on on that platform and what is not allowed on that platform, right? . . . A: He is responsible to know what goes -- what goes on that platform. . . . Q: To your understanding, does the PIC not have authority to control anything about how contractors do work on Talos platform? . . . A: Does he not have the authority? Q: Yeah. A: The PIC has authority on the platforms, ultimate authority.") (form objections omitted). *See also id.* at pp. 270:24-279:91 and pp. 301:2-304:14; Exhibit 2, Talos corporate deposition, pp. 70:6-71:20.

[11]    Exhibit 4, Deposition of Steve Champagne, pp. 270:24-279:91, pp. 301:2-304:14, and p. 275:5-21. *See also* Exhibit 2, Talos corporate deposition, pp. 85:4-86:17 ("Q: Okay. On February 7 -- or on February 17th, 2018, Mr. Bourque would have been responsible, at least, in part, for ensuring the four key features of safe work controls were in place for operations occurring on that platform the day Mr. Jackson was killed, correct? . . . A: Correct. Q: That includes sufficient controls were in

But Mr. Bourque could not have done any of these things on the day of the incident because he did not even bother to show up at the platform and, at minimum, observe the workers whose safety he was supposed to ensure.[12] To be clear, because he was absent from the platform, Mr. Bourque was unable to do a pre-job walk-through with DLS to identify—and then eliminate— potential hazards involved in the step-by-step plan that Mr. Bourque himself had previously devised and expected DLS to follow that day.[13] One of such hazards that remained unidentified and unelimintated—the same hazard that ended up killing Mr. Jackson—was the pipe-falling hazard. So, Mr. Ziegler's opinion on the point is fully corroborated.

### 2. Talos failed to issue a proper JSA for the pipe-removal operation, dooming it from the start.

*Second,* by twisting his opinion around, Talos claims that Mr. Ziegler improperly concluded that Talos was responsible for identifying the hazard that "the DLS crew created" and for guaranteeing a job free from injury.[14] Of course, Mr. Ziegler never offered any such opinions.

Rather, what Mr. Ziegler did opine was that Talos was supposed to identify the hazards involved in the pipe-removal operation as to eliminate, ***ahead of time***, the dangers that DLS was

---

place to limit potential harmful effects of the actions of persons doing work by specifying safety precautions and setting limits to the duration and extent of work, correct? . . . A: Correct. Q: That -- that -- that includes Mr. Bourque was responsible for encouraging attention to safe practices by requiring specified individuals to confirm that all hazards have been identified and effective precautions taken, correct? . . . A: In part, correct. Q: Mr. Bourque would have been responsible for encouraging those responsible for overall site safety to plan the sequence of tasks so that minimal inconvenience and interference is caused o other tasks or production, fair? . . . A: Fair. Q: It allows those responsible for overall site safety to be aware of the various hazardous activities, identify hazardous interactions, prioritize conflicts, working tasks, right? . . . A: Right. Q: And when it comes to persons responsible for overall site safety, according to your own policies and procedures, that's the PIC, correct? . . . A: Correct.") (form objections omitted); Exhibit 7, Deposition of Joseph Tortomase, pp. 340:4-342:18.

[12]   Exhibit 9, Deposition of Stephen DeLue, p. 279:15-281:21. *See also* Exhibit 8, Deposition of John Menser, pp. 235:8-241:16; Exhibit 7, Deposition of Joseph Tortomase, pp. 329:11-339:3.

[13]   Exhibit 9, Deposition of Stephen DeLue, pp. 216:4-218:9. *See also* Exhibit 2, Talos corporate deposition, pp. 188:3-190:3.

[14]   Rec. Doc. 106-1, Talos' memorandum in support, p. 12 of 19.

5

forced to face by following the plan that Talos had contrived for the job.[15] In doing so, Talos would

have eradicated the very danger that killed Mr. Jackson. But Talos' attention to safety was minimal,

at best. In fact, Talos' attention to safety was so minuscule that its JSA, the blueprint that Talos

required DLS to follow for this job,[16] (1) failed to include a hazard analysis[17]—despite being

required to include it,[18] (2) violated Talos' own policies and procedures because Mr. Bourque

---

[15]    Exhibit 1, Edward Ziegler's report, p. 14.

[16]    Exhibit 4, Deposition of Steve Champagne, pp. 124:15-125:2 ("Q: Okay. And that is the procedure
that is supposed to be used by everyone who is involved in the JSA, right? . . . A: Yes. Q: Okay.
And it's not okay for people to deviate from the PIC signed-off-on procedure, right? . . . A: Not --
not unless it's been rereviewed in a new JSA that's been put in place. Didn't have to -- previous to
any deviation.") (form objections omitted). *See also id.* at pp. 116:20-117:16.

[17]    Exhibit 9, Deposition of Stephen DeLue, pp. 216:4-218:9 ("Q: Okay. So even though Talos was
responsible for making sure that it's done safely and that all hazards were properly identified, that
didn't happen by Talos, did it? . . . A: No. Q: How could you ever do a safety analysis without
considering the hazards of any given risk? . . . A: I don't know. Q: So Talos could not have done a
safety analysis and analyzed whether it was safe to remove the firewater piping the way y'all did;
isn't that true? . . . A: True. Q: And they had a responsibility to make sure that each step that y'all
did was safe, right? . . . A: Yes. Q: And they had a responsibility to make sure that all hazards were
analyzed in each of those steps, right? . . . A: Yes. Q: And because we see here that they failed to
do any hazard analysis, they were reckless in letting y'all -- in failing to do that hazard analysis,
weren't they? . . . A: I -- Yeah. Q: They didn't even consider whether there was a dangerous --
whether the way y'all were gonna do it was dangerous or whether there was even a safer way to do
it, did they? . . . A: No. Q: They had a responsibility to be make sure, though, that the way y'all did
it was safe, right? . . . A: Yes.") (form objections omitted) (cleaned up). *See also* Exhibit 2, Talos
corporate deposition, pp. 188:3-190:3.

[18]    *Id. See also* Exhibit 7, Deposition of Joseph Tortomase, pp. 231:19-232:21 ("Q: Now, another way
you could, also, protect people, and mitigate against the risk of falling firewater piping, is you
could, actually, conduct a hazard analysis for going onto that walkway; and implement actions to
eliminate the hazards; right? . . . A: Yes. Q: But first you'd have to care enough to, actually, do a
hazard analysis; and figure out what sorts of risks people would be exposed to by going down there
in the first place; right? . . . A: Right. Q: Now, the only person who had the responsibility to do that
on Talos's platform for Talos's corroding firewater piping is Talos; right? . . . A: Yes.") (form
objections omitted); Exhibit 2, Talos corporate deposition, pp. 87:4-89:6.

signed it without physically visiting the platform[19]—despite being required to visit it,[20] and (3)

called for issuance of hot work and cross barricade permits that Talos never cared to issue[21]—

---

[19]    Exhibit 9, Deposition of Stephen DeLue, p. 279:15-281:21 ("Q: And it says, (reading) 'PIC: The person in charge, PIC, of the facility will approve the JSA only after physically visiting the job location to review the JSA with all involved prior to the commencement of the work.' Did I read that reasonably correctly? A: Yes. Q: Okay. And Jeremy did not do that that day, did he? . . . A: No. Q: All right. Jeremy failed to follow this rule right here, didn't he? . . . A: Yes. . . ."). *See also* Exhibit 8, Deposition of John Menser, pp. 235:8-241:16 ("Q: . . . And so we know that the PIC that day was Jeremy Bourque from Talos; right? A: Right. Q: Okay. And it says the PIC of the facility is supposed to approve the JSA, but only after physically visiting the job location to review the JSA with all involved prior to the commencement of work. Do you see that? (Indicating) A: (Witness examines document.) I do. . . . Q: Now, Jeremy did not do that with you and Walter and everyone else from DLS that day; did he? . . . A: No. Q: But he signed right here. It said he did; didn't he? A: Right. Q: Okay. So he violated this safety policy; didn't he? . . . A: Yeah. . . . Q: He didn't come down there and look and see how y'all were doing it; did he? He didn't come down there and tell you to stop because it's dangerous; did he? . . . A: No. Q: He didn't come down there and figure out ways to eliminate or mitigate the hazards; did he? A: No. . . . Q; He didn't come down there and say, ' No one is allowed to come down to the low' -- 'the lower level'; did he? . . . A: No. . . . Q: He didn't come down there to look at what y'all were doing; did he? A: No.") (form objections omitted) (cleaned up).

[20]    Exhibit 2, Talos corporate deposition, p. 162:1-13, p. 272:12-23, pp. 234:22-235:1; Exhibit 7, Deposition of Joseph Tortomase, p. 325:2-10. *See also* Exhibit 3, BSEE panel report, p. 15 of 26 ("The JSA review section says, 'The PIC of the facility will approve the JSA **only after physically visiting the job location** to review the JSA with all involved prior to the commencement of the work.'") (emphasis added).

[21]    Exhibit 3, BSEE panel report, p. 10 and 23 of 26. *See also* Exhibit 7, Deposition of Joseph Tortomase, p. 356:2-16; Exhibit 9, Deposition of Stephen DeLue, pp. 302:3-303:6; Exhibit 8, Deposition of John Menser, pp. 252:16-256:16; Exhibit 2, Talos corporate deposition, pp. 106:8-107:22; Exhibit 4, Deposition of Steve Champagne, pp. 290:3-291:6 ("Q: And during all wellwork -- so, agree -- you'd agree with me that in this scenario, Mr. Bourque was required to approve the hot work permit for the hot work done on the date of the incident? You agree with that? A: Yes. . . . Q: But at the end of the day, the PIC is the one approving the hot work permit, true? A: Yes. Q: And when you approve a hot work permit, you're verifying that the proper steps were taken to perform hot work, fair? . . . A: Yes.") (form objections omitted) (cleaned up).

despite being required to issue them.[22]  Again, Mr. Ziegler's opinion that Talos' failures allowed a

known[23] but unaddressed hazard to cause a fatality is squarely based on the evidence.

### 3.    Talos failed to properly supervise DLS and intervene when an alleged deviation from Talos' plan occurred.

*Third,* Talos faults Mr. Ziegler for concluding that Talos was responsible for supervising

DLS and intervening when DLS allegedly failed to follow the step-by-step plan that Talos had

devised for the job. But, again, the evidence is decidedly on Mr. Ziegler's side.

Indeed, the undisputed testimony—including that of Talos' own corporate representative

and compliance director—shows that its PIC, Mr. Bourque, (1) was "in charge and serve[d] in a

supervisory capacity" on the platform,[24] (2) "made final decisions relating to all activities and

operations" on the platform,[25] (3) "ha[d] the final decision-making authority to change" anything

he saw was being done unsafely on the platform,[26] and (4) "would have the final decision" if there

was a conflict between how he and a contractor wanted to get a job done.[27] In other words, Mr.

Bourque was not only responsible for supervising the DLS crew—he was responsible for

supervising ***everyone*** and ***everything*** on Talos' platform. And if, during the natural progression of

a job, a deviation from Talos' step-by-step plan occurred—or unsafe work practices were taking

---

[22]    Exhibit 3, BSEE panel report, pp. 16-17 and p. 23 of 26. *See also* Exhibit 2, Talos corporate deposition, pp. 282:23-283:5 ("Q: So on the day of the incident when Mr. Jackson was killed, it is undisputed that a hot work permit was supposed to be issued for that underlying job, correct? A: Correct. . . . Q: Because there was welding going on which would require a hot work permit. Fair? A: Correct.") (form objection omitted).

[23]    Exhibit 6, Talos corrosion mitigation task list ("Out of Service firewater piping hangers are heavily corroded and could break at any time."). *See also* Exhibit 7, Deposition of Joseph Tortomase, pp. 226:16-227:25; Exhibit 4, Deposition of Steve Champagne, pp. 79:16-80:11.

[24]    Exhibit 4, Deposition of Steve Champagne, pp. 128:4 -129:22. *See also id.* at pp. 274:21-275:4; Exhibit 2, Talos corporate deposition, pp. 70:6-71:20.

[25]    Exhibit 2, Talos corporate deposition, pp. 70:6-71:20.

[26]    Exhibit 4, Deposition of Steve Champagne, pp. 301:2-303:14.

[27]    *Id.* at p. 274:21-275:4.

place on the platform—it was the same Mr. Bourque who was responsible for stopping the work, reassessing the situation, and revising the JSA created for that job.[28] To be able to do all of that on the day of this incident, however, Mr. Bourque had to have been present on the platform while the pipe-removal operation was underway. And present he was not.[29]

### 4. Talos' failures precipitated the parting of the rope and Mr. Jackson's presence in the landing zone.

And *fourth,* Talos implies in its motion that it was DLS's fault that the half-inch manila rope snapped during the pipe-lowering process and that Mr. Jackson was in the landing zone when that happened.[30] So Talos takes issue with Mr. Ziegler's opinion that these events were precipitated by Talos' failure to provide adequate tools for the job and to properly barricade the area.[31] But the evidence shows this to be true.

Namely, the company responsible for providing tools for the pipe-removal operation was Talos, and Talos alone.[32] In fact, the evidence shows that Talos and its PIC, Mr. Bourque, were responsible for (1) providing DLS with tools for the pipe-removal work, (2) verifying that the tools which DLS used were safe, and (3) replacing them if they were not safe.[33] In light thereof, Mr.

---

[28] Exhibit 4, Deposition of Steve Champagne, pp. 301:2-303:14, 124:21-125:2 and pp. 116:20-117:16.

[29] Exhibit 9, Deposition of Stephen DeLue, p. 279:15-281:21. *See also* Exhibit 8, Deposition of John Menser, pp. 235:8-241:16; Exhibit 7, Deposition of Joseph Tortomase, pp. 329:11-339:3.

[30] Rec. Doc. 106-1, Talos' memorandum in support, pp. 11-13 of 19.

[31] Exhibit 1, Edward Ziegler's report, pp. 11-12 and pp. 22-26.

[32] Exhibit 7, Deposition of Joseph Tortomase, pp. 458:4-461:4; Exhibit 4, Deposition of Steve Champagne, p. 296:20-24; Exhibit 2, Talos corporate deposition, p. 119:17-21 and pp. 128:18-129:1.

[33] Exhibit 7, Deposition of Joseph Tortomase, pp. 458:4-461:4 ("Q: Mr. Tortomase, per Talos's policy, Talos had the responsibility to provide DLS with the tools necessarily - necessary to safely remove the freeware piping; isn't that true? . . . A: Yes. Q: Okay. And you've been asked a few questions about the rope that was being used to lower the firewater piping. Do you remember those? A: Yes. Q: Okay. And so if there was anything dangerous about using that rope that was used to lower the firewater piping on February 17th, 2018, then that was Talos's fault for failing to provide

9

Ziegler opined that Talos should have equipped DLS with a mechanical lifting/lowering device, such as a hand or an electric winch, or an air hoist.[34] In his opinion, this would have eliminated (1) the risk of the rope getting burned or heated near the hot work activities that were occurring on the upper deck,[35] and (2) the need to have any workers present on the lower deck.[36] But not only did Talos fail to think this through and provide DLS with **any** tools necessary for the job (or verify

---

DLS with the tools that were needed to safely remove the firewater piping; isn't that true? . . . A: Yes. Q: Okay. And so if any of the tools that DLS was using to remove the firewater piping was unsafe, or dangerous, then Talos had the obligation to remove those tools from use; right?  . . . A: Yes. Q: And that means Talos, also, had the responsibility to replace those unsafe, or dangerous tools, with the tools that were necessary to safely remove the firewater piping; isn't that true? . . . [I]f any of the tools that DLS was using to remove the firewater piping were either unsafe, or dangerous, then that was Talos's responsibility to replace those tools with safe tools; right? . . . A: Yes, Q: Because that's how Talos would have, actually, fulfilled its responsibility to have given DLS workers the tools necessary to safely remove the firewater piping; isn't that true? . . . A: Yes.") (form objections omitted) (cleaned up). *See also* Exhibit 4, Deposition of Steve Champagne, p. 296:20-24; Exhibit 2, Talos corporate deposition, p. 119:17-21 and pp. 128:18-129:1; Exhibit 5, Talos SWP manual, at TAL 00046 ("In order to fulfill that responsibility [for implementing Health & Safety measures offshore], Talos must continually strive towards the fulfillment of due diligence by providing employees and contractors with the tools, training, and job knowledge needed in order for those to perform their jobs in a healthy and safe manner.").

34  Exhibit 1, Edward Ziegler's report, pp. 25-26.

35  Exhibit 2, Talos corporate deposition, pp. 282:23-283:5. *See also* Exhibit 4, Deposition of Steve Champagne, p. 287:19-24; Exhibit 1, Edward Ziegler's report, pp. 24-25, ¶¶4.6-4.8.

36  Exhibit 1, Edward Ziegler's report, pp. 24-25, ¶¶4.6-4.8.

that the tools DLS used were safe);[37]  Talos also  ignored DLS crew's concerns about using a half-inch manila rope with no known tensile strength for lowering heavy, metal pipes in the first place.[38]

Further, the evidence shows—and logic confirms—that Mr. Jackson would have never entered the landing zone and been subjected to the pipe-falling hazard had Talos either (1) not devised a job plan that required and allowed entry into that space,[39] or (2) properly barricaded that space as to prevent personnel entry.[40]

Yet again, the faults which Talos attributes to Mr. Ziegler's opinions wilt under scrutiny and record evidence. The Court should deny its motion.

---

[37]    Exhibit 8, Deposition of John Menser, pp. 260:24-263:5 and pp. 194:2-197:23; Exhibit 9, Deposition of Stephen DeLue, pp. 242:21-245:9 ("Q: Here, Talos is saying it is responsible for providing contractors with the tools that are necessary to perform jobs in a safe manner, right? . . . A: Yes. Q: Did they provide any tools to you or our crew to make sure that y'all were removing that firewater piping in a safe manner? . . . A: No. Q: Well, it says here that they were supposed to right here, right? . . . A: Yes. Q: Did you know that they were responsible for -- for providing you with a set of tools that would make sure that it was done in a safe manner? . . . A: No. . . . Q: Well, if they had provided you with any sort of ropes, or chains, or any other devices that could ensure that it couldn't fall, this wouldn't have happened, right? . . . A: Yes. Correct. Q: Okay. So no one at Talos told you that, 'Hold on, guys, y'all don't have to bring your tools on board. We're actually responsible for providing you with a set of tools that are sufficient to get this job done safely.' . . . A: No. They didn't.  . . . Q: And it says here they were supposed to, right? . . . A: Yeah.") (form objections omitted) (cleaned up); *id.* at pp. 248:17-250:1.

[38]    Exhibit 8, Deposition of John Menser, pp. 164:25-166:25 and pp. 207:2-208:12.

[39]    Exhibit 3, BSEE panel report, p. 10 and 23 of 26. *See also* Exhibit 7, Deposition of Joseph Tortomase, p. 356:2-16; Exhibit 9, Deposition of Stephen DeLue, pp. 302:3-303:6; Exhibit 8, Deposition of John Menser, pp. 252:16-256:16 ("Q: . . . When y'all were lowering it, y'all were lowering it inside of a barricaded area; weren't you? A: We were. Q: Okay. So the plan that day that Jeremy didn't review required Walter to go inside that barricaded area; didn't it? . . . A: Yes. Q: Because how else would he -- How else would y'all go retrieve the pipe y'all lowered? . . . A: We wouldn't be able to. Q: No. But the plan required you to; right? A: Right. Q: And no one from Talos even considered whether that was a risk; did they? . . . A: No. . . . Q: And that barricade that was put up, it meant nothing because the job required you go inside that barricade; right? . . . A: It did. Q: And Talos didn't stop to consider whether that was dangerous; did they? A: No. . . .") (form objections omitted) (cleaned up).

[40]    Exhibit 9, Deposition of Stephen DeLue, pp. 204:9-205:9. *See also* Exhibit 7, Deposition of Joseph Tortomase, p. 359:6-13; Exhibit 9, Deposition of Stephen DeLue, pp. 291:7-293:25.

II.     **LAW AND ARGUMENT**

    **A.**     **This Court has considerable discretion in admitting expert testimony; the exclusion of an expert's opinions is the exception rather than the rule.**

Under Federal Rule of Evidence 702 which governs the admissibility of expert witness testimony, the district court "has considerable discretion" to admit or exclude such testimony.[41] "A court's role as a gatekeeper does not replace the traditional adversary system, and '[a] review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.'"[42] As it is well-established by now, (1) "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," and (2) challenges to the bases and sources of an expert's opinion affect the weight to be given to that opinion—not its admissibility.[43] Finally, as a general principle, experts who examine applicable information and explain their conclusions are subject to fair cross-examination, but not to exclusion.[44]

    **B.**     **Contrary to Talos' manufactured theories, Mr. Ziegler's opinions do not constitute impermissible legal conclusions; the motion should be denied.**

Before diving into the merits of Talos' argument, two preliminary points are worth noting.

*First*, interestingly, Talos does not challenge Mr. Ziegler's qualifications or even methodology in reaching his opinions. Perhaps this is so because Talos is aware that any such a challenge would ring hollow. Indeed, having amassed 45-plus years of experience in the offshore/onshore oil and gas, well abandonment, cranes/rigging, and safety industries,[45] Mr.

---

[41]     *Thomas v. W&T Offshore, Inc.,* 2018 WL 4223589, at *3 (E.D. La. 2018).

[42]     *Id.*

[43]     *Id.*

[44]     *E.g.*, *Stewart v. Quality Carriers, Inc.*, 2021 WL 2708924 at *5-6 (M.D.L.A. 2021).

[45]     Exhibit 1, Edward Ziegler's report, p. 6.

Ziegler is immensely qualified to testify in this case. And his experience in working offshore on fixed platforms as a PIC and UWA[46] and in writing programs needed for the issuance of JSAs and similar safety-related documents[47] will be particularly helpful for the jury. Also, the methodology that Mr. Ziegler employed in arriving at his opinions—which consists of studying documentary evidence of Talos' conduct and evaluating it in light of his knowledge, experience, and objective industry standards[48]—is widely accepted by the courts as reliable.[49] So there can be no question that Mr. Ziegler's testimony—which directly relates to the complex, industry-specific issues in this case—will assist the jury and is, thus, relevant.[50]

And *second*, despite the ink which Talos wasted in rehashing its summary judgment argument, the issue in this motion is not whether Talos owed a duty to Mr. Jackson. Rather, the issue here is whether Mr. Ziegler's opinions constitute "impermissible legal conclusions." And the answer is a resounding no. Three simple reasons show why.

One, Mr. Ziegler did not—at all—opine on whether Talos owed any "legal duty" to Mr. Jackson. Indeed, these words do not even appear anywhere in his report.[51] This is exactly why Talos is unable to specify a ***single*** opinion offered by Mr. Ziegler that could conceivably qualify

---

[46]     *Id.* at p. 4.

[47]     *Id.* at p. 5.

[48]     *Id.* at pp. 1-2 and p. 4.

[49]     *E.g., Cooper/T. Smith Stevedoring Co., Inc. v. Bright Navigation, Inc.,* 2019 WL 12528990, at *6 (E.D. La. 2019); *Richardson v. SEACOR Lifeboats, LLC,* 2015 WL 2193907, at *3 (E.D. La. 2015); *Stewart v. Quality Carriers, Inc.,* 2021 WL 2708924 at *5-6 (M.D.L.A. 2021).

[50]     *Prejean v. Satellite Country, Inc.,* 474 F. Supp. 3d 829, 833 (W.D. La. 2020) ("The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed. R. Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue."); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591 (1993).

[51]     *See generally* Exhibit 1, Edward Ziegler's report.

13

as a legal conclusion.[52] As this Court has held, an expert's opinion about the applicable standard of care and whether a defendant met that standard is ***not*** an impermissible conclusion of law.[53] So Talos is inviting this Court to exclude testimony that does not even exist. Because Talos failed to (1) identify, with specificity, the testimony which it seeks to exclude,[54] and (2) "sufficiently" call Mr. Ziegler's testimony in question,[55]  the Court should decline the invitation.

Two, Mr. Ziegler did not offer any legal opinions. In fact, he specifically states as much in his report.[56] But he was well within his rights to opine on Talos' compliance with federal safety regulations and applicable industry standards in forming his opinions. Indeed, federal safety regulations are relevant evidence in weighing a defendant's culpability.[57] And so is an expert's

---

[52]   *Id.* at pp. 11-12.

[53]   *Mobil Expl. & Producing v. A-Z/Grant Int'l Co.*, 1996 WL 194931, at *3 (E.D. La. 1996) (finding that testimony concerning the existence of certain standards and regulations and whether a conduct of a party was consistent therewith did not amount to an impermissible legal conclusion); *Richardson v. SEACOR Lifeboats, LLC,* 2015 WL 2193907, at *3 (E.D. La. 2015) (finding that an expert's opinion that a crane operator failed to safely operate a crane was not an impermissible legal conclusion and allowing the expert to testify about the reasonable standard of care regarding crane operations and whether the defendant met that standard of care); *Thomas v. W&T Offshore, Inc.,* 2018 WL 4223589, at *7 (E.D. La. 2018).

[54]   *Howard v. Offshore Liftboats, LLC*, 2016 WL 9444450, at *1 (E.D. La. 2016) ("Evidentiary objections must be specific at trial and in motions *in limine*."). *See also Asbury v. MNT, Inc.*, 2013 WL 12143046, at *1 (D.N.M. 2013) ("In ruling on a motion in limine, the Court must determine if the movant has met his or her burden of proving the inadmissibility of the evidence. . . . To carry out that burden, 'the movant should *identify the particular evidence at issue and articulate with specificity* the arguments supporting the position that the particular evidence is inadmissible on any relevant ground. A court is well within its discretion to deny a motion in limine that *fails to identify the evidence with particularity* or to present arguments with specificity.'") (emphasis added).

[55]   *Rodriguez v. Riddell Sports, Inc.,* 242 F.3d 567, 581 (5th Cir. 2001) ("To trigger a *Daubert* inquiry, an expert's testimony, or its 'factual basis, data, principles, methods, or their application,' must be 'called ***sufficiently*** into question.'") (emphasis added); *Lumpkin v. Keaton Transp. Servs., Inc.,* 2005 WL 6737600, at *3 (E.D. Tex. Apr. 11, 2005).

[56]   Exhibit 1, Edward Ziegler's report, p. 3 ("The opinions given are not intended to be legal opinions.").

[57]   *Romero v. Mobil Expl. & Producing N. Am., Inc.,* 939 F.2d 307, 311 (5th Cir. 1991). *See also McAdams v. Louisiana Power & Light Co.,* 95-126 (La. App. 5 Cir. 7/25/95), 659 So. 2d 820, 824 ("[A] plaintiff may offer a statute or regulation as evidence of a defendant's negligence even when that statute or regulation cannot be used to establish negligence per se."); *Manchack v. Willamette*

opinion on compliance with those regulations.[58] This is so because "a regulation provides evidence

of the general standard of care" in the industry.[59] And expert witnesses are routinely allowed to

testify as to industry standards and whether a defendant complied with them.[60] Without such

---

*Indus., Inc.,* 621 So. 2d 649, 653 (La. App. 2 Cir. 1993) ("Violations of the regulations are intuitively relevant as evidence that premises are unreasonably dangerous, though they cannot be used as conclusive proof."); *Gantt v. Seadrill Americas, Inc.,* 360 F. Supp. 3d 402, 408, n. 30 (E.D. La. 2018); *Williams v. Union Pac. R. Co.,* 1992 WL 395285, at *2 (E.D. La. 1992).

[58]     *Id. See also Ponds v. Force Corp.,* 2016 WL 7178483, at *4–5 (E.D. La. 2016) ("The Fifth Circuit has explained that '[a] plaintiff may properly offer a statute or regulation as evidence of a defendant's negligence even when that statute or regulation cannot be used to establish negligence per se.'") (internal citation omitted); *Waters v. Lowe's Home Centers, LLC,* 2019 WL 5309969, at *3 (E.D. La. 2019); *Woods v. Seadrill Americas, Inc.,* 2017 WL 8293244, at *3 (E.D. La. 2017); *Shawler v. Ergon Asphalt & Emulsions, Inc.,* 2016 WL 1019121, at *4 (E.D. La. 2016).

[59]     *Alford v. Anadarko E&P Onshore LLC,* 2015 WL 471596, at *12 (E.D. La. 2015) (emphasis omitted). *See also Campbell v. Keystone Aerial Survs., Inc.,* 138 F.3d 996, 1003 (5th Cir. 1998) ("Even if a violation of a regulation does not constitute negligence per se, failure to comply with a regulation may     still provide evidence that     the defendant     deviated     from the applicable standard of care."); *White v. C F Indus., Inc.,* 411 So. 2d 511, 516, n.5 (La. App. 1 Cir. 1982) ("MESA regulations may be cogent in establishing a standard of care but violation thereof is not of itself determinative of negligence."); *Jones v. Buck Kreihs Marine Repair, L.L.C.,* 2013-0083 (La. App. 4 Cir. 8/21/13), 122 So. 3d 1181, 1187 ("Louisiana law is clear that '[w]hile statutory violations are not in and of themselves definitive of civil liability, they may be guidelines for the court in determining standards of negligence by which civil liability is determined.'"); *Comardelle v. Sears, Roebuck & Co.,* 1996 WL 63100, at *2 (E.D. La. 1996) ("In this matter, the court finds that OSHA regulations and ANSI standards are relevant evidence of industry practice and standard of care regardless of the fact that this case arises in the consumer context rather than in the employment context. However, evidence of non-compliance with the subject OSHA regulations and ANSI 01.1 is *not* conclusive of defendant's liability. It is up to the trier of fact to weigh this evidence, with all the other evidence presented at Trial . . . ") (emphasis original).

[60]     *Deville v. Conmaco/Rector, L.P.,* 2011 WL 13213666, at *3 (E.D. La. 2011) ("Closson is permitted to opine as to the factual cause of the accident, as well as industry standards. *Ostrowiecki v. Aggressor Fleet, Ltd.*, 2008 WL 2789142, *7 (E.D. La. 7/17/08) (permitting the expert to testify as to industry standards)."); *Richardson v. SEACOR Lifeboats, LLC,* 2015 WL 2193907, at *3 (E.D. La. 2015) ("The Court finds Mr. Madeley's opinions will be helpful to the Court and are not impermissible conclusions of law. Mr. Madeley will be allowed to testify about the reasonable standard of care concerning crane operations and conducting personnel basket transfers and, in his opinion, whether SEACOR met that standard of care. This includes Mr. Madeley's opinion on applicable API standards and whether SEACOR complied with those standards."); *McElgunn v. CUNA Mut. Grp.,* 2009 WL 1578489, at *2 (D.S.D. 2009) ("Because Fye is qualified as an expert in the insurance industry, he may testify as to the industry standards and whether defendants complied with those standards. This testimony will assist the jury in understanding what standards the insurance companies must follow."); *Patriot Contracting, LLC v. Star Ins. Co.,* 2018 WL 10797881, at *5 (E.D. La. 2018) ("Caldarera may not testify to legal conclusion or

objective standards, "there is no reliable foundation for [the] expert opinion."[61] And if that weren't enough, this Court has specifically recognized that "[expert] testimony analyzing the conduct of the various parties with respect to various applicable rules and regulations may assist the trier of fact without crossing the line into impermissible legal conclusions."[62] The reason makes perfect sense: Expert witnesses "may and in fact *must* cite certain objective standards, including federal regulations, in coming to the conclusions" in their expert reports.[63]

And three, Talos seeks to exclude Mr. Ziegler's testimony based on the *facts* that he used in his analysis and the *conclusions* that he reached.[64] But, as shown here, Mr. Ziegler's opinions are fully supported by a formidable body of record evidence—the evidence which, not in the least, includes documents created and testimony given by Talos and its employees. And the fact that Mr. Ziegler's opinions are unfavorable to Talos is certainly not a ground to exclude them. Besides, the law is clear in this regard: (1) Any concerns that Talos may have regarding the factual bases and

---

speculate as to the motivations of the parties, but may testify to industry standards and customs, including those embodied in the Contract Documents.").

[61]   *Ross v. Willard*, 2007 WL 4374027, at *1 (M.D. La. 2007) ("Without 'industry standards' to rely upon, [the expert] seems to base his conclusions on his own authority. Because 'knowledge connotes more than subjective belief or unsupported speculation,' there is no reliable foundation for [the] expert opinion.").

[62]   *Ponds v. Force Corp.,* 2016 WL 7178483, at *4–5 (E.D. La. 2016). *See also Shell Offshore, Inc. v. Tesla Offshore, L.L.C.,* 2015 WL 5714622, at *6 (E.D. La. 2015); *Mobil Expl. & Producing v. A-Z/Grant Int'l Co.*, 1996 WL 194931, at *3 (E.D. La. 1996).

[63]   *Tajonera v. Black Elk Energy Offshore Operations, L.L.C.,* 2016 WL 9414347, at *12 (E.D. La. 2016) (emphasis added). *See also Ross v. Willard*, 2007 WL 4374027, at *1 (M.D. La. 2007).

[64]   Rec. Doc. 106-1, Talos' memorandum in support, p. 5 of 19.

sources underpinning Mr. Ziegler's opinions only go to the weight—not to the admissibility—of his testimony,[65] and (2) *Daubert* does not test an expert's conclusions.[66]

The recourse for Talos' discontent with Mr. Ziegler's opinions, if any, lies in cross-examination and presentation of contrary evidence.[67] Certainly not in a wholesale exclusion of Mr. Ziegler's testimony—the testimony which is supported by a formidable body of documentary evidence adduced in this case. This is yet another reason why Talos' motion should be denied.

---

[65]    *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir. 1987) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."); *Burst v. Shell Oil Co.,* 120 F. Supp. 3d 547, 551 (E.D. La. 2015).

[66]    *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1318 (9th Cir. 1995) ("[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology."); *Dinett v. Lakeside Hosp.,* 2000-2682 (La. App. 4 Cir. 2/20/02), 811 So. 2d 116 ("*Daubert* is inapplicable to the instant situation because it is not the experts' methodology that is being questioned; rather, it is the conclusions they reached in applying that methodology to the instant facts.") *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998) ("The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable."); *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . It is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound."); *Raynor v. Merrell Pharms. Inc.,* 104 F.3d 1371, 1375 (D.C. Cir. 1997) ("Plaintiffs contend that the district court erroneously applied the principles of *Daubert* by focusing on the conclusions of their experts rather than on the methodology. They are correct that the Supreme Court stated that the inquiry should 'focus ... solely on principles and methodology, not on the conclusions that they generate.'").

[67]    *Keener v. Mid-Continent Cas.,* 01-1357 (La. App. 5 Cir. 4/30/02), 817 So. 2d 347, 354–55 ("The court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. As with all other admissible evidence, expert testimony is subject to being tested by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'").

### C.     Mr. Ziegler's testimony is not repetitive or cumulative.

As an alternative, Talos presents a catch-all argument that the testimony of the plaintiffs' experts is somehow "duplicative," but the theory fails under Fifth Circuit precedent. Indeed,  "the Fifth Circuit has not put a precise limit on the number of experts that can testify regarding a particular issue."[68] "Multiple experts may testify to the same conclusion if they approached their individual analyses from separate 'vantage points.'"[69] So, because it is difficult to establish the necessity and cumulative effect of testimony offered by several experts, "the Court has wide discretion in allowing experts to testify."[70] And second, "[u]nder federal law, 'cumulative evidence' is evidence that 'supports a fact established by existing evidence. But evidence that supports previous testimony on a *contested issue* is not cumulative, it is corroborative."[71] And just because expert testimony may overlap does not mean that it is impermissibly cumulative.[72] Each of these points apply with great force here. They will be discussed in turn.

---

[68]     *Parker v. John W. Stone Oil Distributors, L.L.C.,* 2019 WL 3891574, at *3 (E.D. La. 2019) (citing *Leefe v. Air Logistics, Inc.*, 876 F.2d 409, 411 (5th Cir. 1989)).

[69]     *Id.* (internal citations omitted).

[70]     *Id.*

[71]     *Gilbreath v. Winkleski,* 476 F. Supp. 3d 804, 822 (W.D. Wis. 2020) (emphasis original). *See also Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) ("Evidence that provides corroborating support to one side's sole witness on a central and hotly contested factual issue cannot reasonably be described as cumulative."); *United States v. Vickers,* 442 F. App'x 79, 84 (5th Cir. 2011) ("The evidence of the injuries is not cumulative evidence, but corroborative evidence—the existence of the injuries, particularly the photos of said injuries, is being used to corroborate the testimony of Craig and Rabalais that Craig was physically struck by Vickers. Such corroboration was beneficial, if not necessary, in a case that was largely decided on the credibility of the prosecution's witnesses versus that of the defendant's witnesses.").

[72]     *Parker,* 2019 WL 3891574, at *3 ("Therefore, while there may be some overlap, Dr. Wakeman's testimony and Dr. Howze's and Dr. Pellegrin's testimony are not impermissibly cumulative of each other.").

### 1.   The plaintiffs' experts opined and testified from different vantage points; their opinions and testimony are not cumulative.

Besides its conclusory statement that the testimony of the plaintiffs' experts is somehow "duplicative," Talos did not present this Court with any concrete citation in support of this bold notion. Still, Talos claims that the testimony of the plaintiffs' experts is cumulative because "they are all premised [upon] the same exact foundation, i.e., what legal duties Talos owed to DLS and Mr. Jackson."[73] Not only is the argument difficult to take seriously, but—as noted above—neither one of the experts ever offered any such opinion.[74]

Further, Talos provides no legal authority whatsoever to support its theory that retaining three experts to shed light on a case involving facts as complex as these is cumulative. No such authority even exists. These experts' opinions—reached from *different vantage points*—are not, by law, cumulative.[75] Indeed, these experts have different background, experience, and training, and have focused on different aspects of this case.[76] And to the extent that some of their conclusions overlap, the fact that their individual analyses came from separate vantage points takes their opinions out of the purview of being "cumulative".[77] Thus, this Court should allow them to offer their opinions and testimony at trial.

---

[73]   Rec. Doc. 106-1, Talos' memorandum in support, p. 18 of 19.

[74]   *See* Rec. Doc. 105-2, Rex Anderson's report, Rec. Doc. 103-19, Martin Gee's report, and Rec. Doc. 106-2, Edward Ziegler's report.

[75]   *Parker,* 2019 WL 3891574, at *3

[76]   Compare Rec. Doc. 105-2, Rex Anderson's report, with Rec. Doc. 103-19, Martin Gee's report and Rec. Doc. 106-2, Edward Ziegler's report.

[77]   *Parker,* 2019 WL 3891574, at *3.

### 2.   Testimony of the plaintiffs' experts is not cumulative—it is corroborative.

Federal law provides that evidence that supports previous testimony on an issue that the parties dispute is not cumulative.[78] Rather, it is corroborative.[79] And as the Fifth Circuit observed, "[s]uch corroboration is beneficial, if not necessary," in a case that will largely hinge on the credibility of expert witnesses.[80] The parties here certainly contest the issues on which the plaintiffs' experts have opined, such as (1) the factors that contributed to the incident, (2) whether there were implementation and compliance issues on Talos' platform, and (3) whether Talos acted appropriately under the circumstances. The fact that Martin Gee, Rex Anderson, and Edward Ziegler's opinions on these issues may coincide does not suggest that they are impermissibly or "needlessly" cumulative.[81] And these experts' opinions are far from needless—especially considering the complexity of this case. Their independent evidentiary value has a probative effect that raises them from being allegedly cumulative to being contributory to the determination of the truth.[82]

### III.   CONCLUSION

The Court should deny Talos' motion in its entirety.

---

[78]   *Gilbreath v. Winkleski,* 476 F. Supp. 3d 804, 822 (W.D. Wis. 2020) (emphasis original). *See also Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) ("Evidence that provides corroborating support to one side's sole witness on a central and hotly contested factual issue cannot reasonably be described as cumulative.").

[79]   *Id.*

[80]   *United States v. Vickers*, 442 F. App'x 79, 84 (5th Cir. 2011).

[81]   *Parker,* 2019 WL 3891574, at *3. *See also* Fed. Rule of Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … ***needlessly*** presenting cumulative evidence.") (emphasis added).

[82]   *See United States v. Kizeart,* 102 F.3d 320, 325 (7th Cir. 1996).

Respectfully submitted,

/s/      *Kyle Findley*
J. Kyle Findley (#34922)                         Zachary P. McFarlane (#38832)
kfindley@arnolditkin.com                        zmcfarlane@zehllaw.com
John G. Grinnan (*Pro Hac Vice* granted)        Michael E. Streich
jgrinnan@arnolditkin.com                        mstreich@zehllaw.com
**ARNOLD & ITKIN LLP**                          **ZEHL & ASSOCIATES, PC**
6009 Memorial Drive                             2700 Post Oak Blvd., Suite 1000
Houston, TX 77007                               Houston, TX 77056
Telephone: 713-222-3800                         Telephone: 713.491.6064
Facsimile: 713-222-3850                         Facsimile: 713.583.1492
e-service@arnolditkin.com

                                                **ATTORNEYS     FOR      VANTRECE
                                                JACKSON**

-AND-

Michael Cox (# 22026)
mike.cox@coxcoxfilo.com
COX, COX, FILO, CAMEL & WILSON LLC
723 Broad Street
Lake Charles, LA 70601
Tel: 337.436.6611
Fax: 337.436.9541

**ATTORNEYS FOR ANIKA WARNER**

### <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of this pleading has been sent to all counsel of record in accordance with the Rules of Civil Procedure on this 4th day of February, 2022.

                              /s/      *Kyle Findley*