## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

| | |
|---|---|
| **ANIKA WARNER, ET AL.,** | *   **CIVIL NO.:  2:18-cv-01435-JDC-KK** |
| | *   **(LEAD)** |
| | * |
| **VERSUS** | *   **JUDGE JAMES D. CAIN, JR.** |
| | * |
| | *   **MAG. JUDGE KATHLEEN KAY** |
| **TALOS ERT, LLC, ET AL.** | * |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## PLAINTIFFS' OPPOSITION TO DEFENDANT DIVERSE
## SAFETY & SCAFFOLDING, LLC'S MOTION FOR SUMMARY JUDGMENT

J. Kyle Findley (#34922)
kfindley@arnolditkin.com
John G. Grinnan (*Pro Hac Vice* granted)
jgrinnan@arnolditkin.com
**ARNOLD & ITKIN LLP**
6009 Memorial Drive
Houston, TX 77007
Telephone: 713-222-3800
Facsimile: 713-222-3850
e-service@arnolditkin.com

Zachary P. McFarlane (#38832)
zmcfarlane@zehllaw.com
Michael E. Streich
mstreich@zehllaw.com
**ZEHL & ASSOCIATES, PC**
2700 Post Oak Blvd., Suite 1000
Houston, TX 77056
Telephone: 713.491.6064
Facsimile: 713.583.1492

**ATTORNEYS FOR VANTRECE JACKSON**

-AND-

Michael Cox (# 22026)
mike.cox@coxcoxfilo.com
COX, COX, FILO, CAMEL & WILSON LLC
723 Broad Street
Lake Charles, LA 70601
Tel: 337.436.6611
Fax: 337.436.9541

**ATTORNEYS FOR ANIKA WARNER**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS……………………………………………………………...…..............ii

TABLE OF AUTHORITIES…………………………………………………………...…...........iv

I.      INTRODUCTION……………………………………………………………………1

II.     BACKGROUND………………………………………………………………….....3

        A.      Despite being well-aware of the falling hazard posed by corroded
                firewater pipes, Talos does nothing to eliminate it for over 20 years……………..3

        B.      Talos hires DLS to remove the corroded firewater pipes and Diverse
                to build the scaffolding needed for the removal…………………………………4

        C.      But Diverse fails to install toe boards on its scaffolding; it also
                fails to eliminate or at least warn about the risk that lack of toe
                boards created………………………………………………………………...6

                1.      In violation of its own policies and procedures, as well as OSHA
                        standards, Diverse fails to install toe boards on its scaffolding……………6

                2.      In addition to not installing toe boards, Diverse fails to
                        generate an MOC, stop the work, and report and warn of the hazard………8

                3.      Diverse also fails to "yellow-tag" its scaffolding to warn that it
                        was built out of compliance and that it was not safe………………………11

        D.      Diverse's failures have practical consequences, as evident from the
                pipes found on the bottom of the Gulf of Mexico; their failures helped
                cause this incident…………………………………………………………..13

III.    LAW AND ARGUMENT………………………………………………………...…..16

        A.      Summary judgment is proper only if there are no disputed material facts………16

        B.      An independent contractor owes a duty to another independent contractor's
                employees to exercise reasonable care and to refrain from creating a
                hazardous condition…………………………………………………………...16

C.      Diverse's attempt at summary judgment is doomed by the BSEE finding
        of causation and the testimony of its own corporate representative……………17

        1.      By failing to install toe boards, do an MOC, exercise its stop
                work authority, and report and warn about the issue, Diverse
                created an unreasonable risk of harm or a hazardous condition…………..18

        2.      Diverse's failures contributed to this incident; its motion defies
                the testimony of its own corporate representative and
                the BSEE findings…………………………………………………………..21

        3.      Diverse's attempt to blame DLS and hide behind easily
                distinguishable jurisprudence further reveals the weakness of its
                argument…………………………………………………………………22

IV.     CONCLUSION…………………………………………………………………...25

## **TABLE OF AUTHORITIES**

**Cases**

*Blaze v. McMoran Oil & Gas LLC,*
   2018 WL 4925666 (W.D. La. 2018)…....…………………………………………………23-24

*Harris v. Pizza Hut of Louisiana, Inc.,*
   455 So. 2d 1364 (La. 1984)…………………………………………………………..17

*Little v. Liquid Air Corp.,*
   37 F.3d 1069 (5th Cir. 1994)…………………………………………………………16

*Lindsey v. Sears Roebuck and Co.,*
   16 F.3d 616 (5th Cir. 1994)………………………………………………………...……16

*Fornah v. Schlumberger Tech. Corp.,*
   737 F. App'x 677 (5th Cir. 2018)…………………………………………………16-17

*Lafont v. Chevron, U.S.A., Inc.,*
   593 So. 2d 416 (La. App. 1st Cir. 1991)…………………………………………17, 21

*McCarroll v. Seatrax Servs., Inc.,*
   2013 WL 3872219 (E.D. La. 2013)……………………………………………...17, 21

*McCarroll v. Wood Grp. Mgmt. Servs., Inc.,*
   561 F. App'x 407 (5th Cir. 2014)…………………………………………………17, 21

*Singleton v. Fieldwood Energy, LLC,*
   2016 WL 3902599 (E.D. La. 2016)…………………………………………………16

*Smith v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.,*
   372 F. Supp. 3d 431 (E.D. La. 2019)…………………………………………………24

*Socorro v. City of New Orleans,*
   579 So. 2d 931 (La. 1991)…………………………………………………………17

**Statutes**

Fed. R. Civ. P. 56…………………………………………………………………16

La. Civ. Code art. 2315………………………………………………………...16

**PLAINTIFFS' OPPOSITION TO DEFENDANT DIVERSE
SAFETY & SCAFFOLDING, LLC'S MOTION FOR SUMMARY JUDGMENT**

The plaintiffs, Anika Warner and Vantrece Jackson, oppose the motion for summary

judgment filed by Diverse Safety & Scaffolding, LLC ("Diverse").[1]

## I.    INTRODUCTION

This Court is familiar with the facts of this case. Talos ERT, LLC hired DLS, LLC and Mr.

Walter Jackson to remove useless and heavily corroded firewater piping on its WC 215-A offshore

platform ("the platform"). Mr. Jackson was killed in the process. This process entailed cutting the

corroded firewater piping into sections and, using a half-inch manila rope, lowering it from the

scaffolding deck to a +10 deck below. The scaffolding deck was built by Diverse, another

independent contractor hired by Talos. But, in contravention of industry standards and its own

policies and procedures, Diverse built a scaffold that did ***not*** have toe boards to prevent objects

from falling from a height and striking someone in the vicinity. Ultimately, Mr. Jackson died from

the injuries sustained after a pre-cut pipe fell from the upper deck and struck him in the head.

This suit against Talos and Diversity ensued. But, conflating the plaintiffs' allegations

against ***Talos*** with those against ***it***, Diversity now moves for summary judgment. It argues that the

plaintiffs have "no facts" to support their negligence claims against it and that the lack of toe

boards played no role in Mr. Jackson's demise. Neither notion is true. And for three simple reasons.

*First,* in its motion, Talos ignores the (undisputed) evidence against it. That evidence shows

that—in violation of industry standards and its own policies and procedures—Diverse failed to (1)

install toe boards on the scaffolding, (2) stop the work and prevent DLS workers from stepping on

the scaffolding, (3) report the issue and warn about the risk that the lack of toe boards created, and

---

[1]    Rec. Doc. 91, Diverse's motion for summary judgment.

(4) "yellow tag" the scaffold to warn DLS that it was out of compliance with industry guidelines—thereby misleading DLS into thinking that the scaffold was safe. And safe it was not. The pipes on the bottom of the Gulf of Mexico which rolled over the scaffold and fell into the water are the proof of that. So it was only a matter of time when these pipes would find their human target. By virtue of having built the scaffold, Diverse was well-aware of this danger. But, for a reason still unknown, it never cared to eliminate it or—at least—warn about it. Instead, Diverse decided to keep quiet and play Russian roulette with the lives of DLS workers. So, contrary to Diverse's arguments, the facts to support a finding of liability against it **do** exist.

*Second,* after investigating the circumstances surrounding Mr. Jackson's death, the Bureau of Safety and Environmental Enforcement ("BSEE") concluded that Diverse's failures were a contributing cause of the accident. And for a good reason. But for Diverse's failure to install toe boards, and to properly warn about it, Mr. Jackson would have never been exposed to the pipe-falling hazard. In other words, had Diverse made DLS aware of the lack of toe boards, the entire pipe-removal operation would have been suspended and no DLS worker would have even been present on the platform. But the BSEE's logic seems to make sense to everyone but Diverse. Indeed, even Diverse's own corporate representative readily conceded—on no less than **four** different occasions—that Mr. Jackson's death would have been prevented had Diverse acted in compliance with industry standards and its own policies and procedures.

And *third,* Diverse's Hail Mary effort to excuse its failures by pointing the finger elsewhere is actually counterproductive. For instance, Diverse argues that the reason why it did not erect toe boards was because DLS's construction foreman, Stephen DeLue, instructed it not to. Not only does Diverse put forth **no** evidence on the point, but Mr. DeLue explicitly testified that he never gave any such instructions. Besides, as Diverse's corporate representative explained, even if such

2

an instruction was given—and Diverse followed it—that would be even ***stronger*** evidence of its negligence. It would mean that Diverse, a scaffolding expert, went against industry guidelines and its own policies—and endangered everyone on the platform—on suggestion of a third party with no knowledge about scaffolding. Similarly, Diverse argues that the lack of toe boards could not have contributed to this accident because DLS workers allegedly pushed the pipe off the scaffolding—indicating that it did not roll over. The argument, however, is nonsensical. Even if it were true that DLS workers pushed the pipe in order to lower it down, it is exactly the ***presence of toe boards*** that would have prevented them from doing so.

In sum, the record evidence shows that Diverse did not exercise reasonable care and that it, in fact, created—or at least helped create—the hazardous condition that killed Mr. Jackson. That is exactly why Louisiana law charges it with a duty of care. And had Diverse acted as its own policies and procedures required it to act upon realization that its scaffolding was defective, Mr. Jackson would have never been in a position to be struck by a falling pipe and his death would have been prevented.

Diverse's motion is meritless and should be denied.

## II.   BACKGROUND

### A.   Despite being well-aware of the falling hazard posed by corroded firewater pipes, Talos does nothing to eliminate it for over 20 years.

Talos is the owner and operator of the WC 215-A offshore platform in the Gulf of Mexico.[2] The firewater piping system on the platform had been out of service since 1995.[3] But, for more than 20 years, Talos left these useless firewater pipes to corrode. And the issue remained neglected by Talos until the BSEE visited the platform on October 13, 2016.

---

[2]   Exhibit 1, Talos' corporate deposition, p. 58:17-24. *See also* Exhibit 2, Martin Gee's report, p. 2.

[3]   Exhibit 3, 2020 BSEE panel report, p. 11 of 26.

After inspecting the platform, the BSEE cited Talos with noncompliance and put it on notice that its firewater piping system presented a "falling hazard."[4] So, in October of 2016, the BSEE ordered Talos to fix its "heavily corroded" out-of-service piping.[5] But Talos took its time. It was not until the BSEE paid Talos another visit on February 1, 2018, and cited it—yet again— for unsafe corrosion on its platform,[6] that Talos finally decided to do something about this potentially fatal hazard.[7]

### B. Talos hires DLS to remove the corroded firewater pipes and Diverse to build the scaffolding needed for the removal.

Talos hired Mr. Jackson's employer, DLS, to help remove the corroded firewater piping. But scaffolding needed to be built for the project in order to physically access the high-up firewater pipes.[8] So Talos hired Diverse, a scaffolding expert,[9] to build it.[10]  Because the firewater pipes were stationed at greater heights, Diverse erected high hanging scaffolding to enable DLS to reach

---

[4]     Exhibit 5, 2016 BSEE notification of incidents of noncompliance (INC), p. 3 of 7. *See also* Exhibit 4, Deposition of Steve Champagne, pp. 217:2-218:25 and p. 146:14-21.

[5]     Exhibit 5, 2016 BSEE notification of incidents of noncompliance (INC), p. 3 of 7. *See also* Exhibit 4, Deposition of Steve Champagne, pp. 214:18-216:13.

[6]     Exhibit 6, 2018 BSEE notification of incidents of noncompliance (INC), p. 2.

[7]     Exhibit 4, Deposition of Steve Champagne, pp. 79:16-80:11.

[8]     Exhibit 1, Talos' corporate deposition, p. 375:7-14 ("Q: In February of 2018, Talos hired Diverse to erect scaffolding in order for Talos to remove the fire water piping that we've been talking about here today, right? A: Yes. Q: The purpose of that scaffolding built by Diverse is to allow people to actually physically access the fire water piping, right? A: Correct.").

[9]     Exhibit 7, Diverse's corporate deposition, pp. 175:2-176:1 and p. 65:7-14.

[10]    *Id. See also* Exhibit 8, DLS's corporate deposition, p. 396:12-25 ("Q: Mr. Tortomase, do you know who hired Diverse to do the scaffolding? A: Talos. Q: DLS did not hire Diverse; did they? A: No; we work close with Diverse on all -- a lot of jobs and they bill directly to Talos; we didn't hire 'em. Q: All right. What was the reason for the scaffolding? A: To build underneath the deck to remove the firewater piping, and the other -- other things that had to be done on that project.").

them.[11] And the risk present at any scaffolding, perhaps especially the high hanging one, is the risk of objects falling from a height to a lower deck and striking someone in the vicinity.[12]

The number one way to eliminate this risk of falling objects to install toe boards.[13] Toe boards prevent objects from falling, rolling over, or even being ***kicked*** off the scaffolding.[14] This is exactly why (1) Occupational Safety and Health Administration ("OSHA") guidelines,[15] (2) Talos' safe work practices,[16] and (3) Diverse's own policy and procedures[17]—all, without exception, ***require*** that toe boards be installed on scaffolding.   DLS, the company whose employees were actually working on top of the scaffold, expected Diverse to build it in compliance with these standards, policies, and safe work practices.[18] And this expectation was not, at all, surprising: Every company that DLS ever worked with required toe boards to be installed.[19]

---

[11]    Exhibit 7, Diverse's corporate deposition, pp. 62:21-70:6.

[12]    *Id.*

[13]    Exhibit 8, DLS's corporate deposition, p. 398:3-11. *See also* Exhibit 9, Deposition of Stephen DeLue, p. 34-1-10; Exhibit 1, Talos' corporate deposition, pp. 380:5-23 and p. 378:11-20.

[14]    Exhibit 7, Diverse's corporate deposition, p. 209:17-211:18. *See also* Exhibit 15, OSHA regulations, p. 3 of 4.

[15]    Exhibit 7, Diverse's corporate deposition, p. 152:11-18 ("Q: You'd agree with me toe boards are required by OSHA and company policy. Correct? . . . A: Correct. Q: Correct? A: Yes, sir.") (form objection omitted).

[16]    Exhibit 10, Talos' safety work practices manual, p. 28 of 110, ¶4.4.12.

[17]    Exhibit 7, Diverse's corporate deposition, p. 152:11-18. *See also* Exhibit 11, Diverse's scaffold policy and procedures, p. 19, ¶2(c) ("Where there is a danger of tools, materials or equipment falling from a height and striking employees below the following applies: . . . A toe board ***shall*** be erected along the edge of platforms . . .") (emphasis added); Exhibit 3, 2020 BSEE panel report, p. 13.

[18]    Exhibit 8, DLS's corporate deposition, p. 397:1-6 ("Q: Did DLS expect Diverse to build the scaffolding correctly? . . . A: Yes.") (form objection omitted). *See also id.* at pp. 390:4-19 ("Q: All right. If Talos has a particular safety rule, or guideline, did DLS expect Talos would follow that safety rule, and guideline, at the time of this accident? . . . A: Yes. Q: Did it rely on Talos to do that? . . . A: Yes. Q: Same for DSS [Diverse]? A: Yes.") (form objections omitted).

[19]    Exhibit 8, DLS's corporate deposition, p. 398:17-22 ("Q: Do you know what Talos's policy, or procedure, is about the use of toe boards on open-sided floors, or platforms? A: I don't know, particularly, Talos's verbiage; every company I ever work for, toe boards are required.").

**C.    But Diverse fails to install toe boards on its scaffolding; it also fails to eliminate or at least warn about the risk that the lack of toe boards created.**

**1.    In violation of its own policies and procedures, as well as OSHA standards, Diverse fails to install toe boards on its scaffolding.**

The undisputed evidence shows that Diverse should have never built the scaffolding *without* toe boards.[20] Yet, in violation of its own policy and procedures,[21] Diverse did exactly that.[22] And it openly admits the point in its motion.[23]

But Diverse says its failure to do so was justified. Diverse argues that DLS's construction foreman, Stephen DeLue, allegedly gave instructions for the toe boards ***not*** to be installed because they would have interfered with the job.[24] Four pieces of evidence kneecap that theory.

*One*, in no uncertain terms, Mr. DeLue testified that he never instructed anyone not to install toe boards on the scaffolding.[25] As he explained, any indication to the contrary would be plainly incorrect.[26] *Two,* as the BSEE noted, the toe boards were actually listed in the Job Safety

---

[20]    Exhibit 3, 2020 BSEE panel report, p. 24 ("Per Diverse Policy and Procedure, the scaffolding should not have been built without toe boards or two access area."). *See also* Exhibit 8, DLS's corporate deposition, pp. 400:18-401:7 ("Q: All right. Were there any toe boards? A: No. Q: Based on your review of this policy, should there have been toe boards? . . . A: Yes; they should have toe boards.") (form objections omitted).

[21]    Exhibit 7, Diverse's corporate deposition, p. 152:11-18. *See also* Exhibit 11, Diverse's scaffold policy and procedures, p. 19, ¶2(c) ("Where there is a danger of tools, materials or equipment falling from a height and striking employees below the following applies: . . . A toe board ***shall*** be erected along the edge of platforms . . .") (emphasis added); Exhibit 3, 2020 BSEE panel report, p. 13.

[22]    Exhibit 8, DLS's corporate deposition, p. 398:12-16 ("Q: Do you know whether toe boards were used on the scaffolding built by Diverse on the date of the accident? A: I do know that they did not have toe boards on 'em."). *See also* Exhibit 1, Talos' corporate deposition, pp. 379:24-4 ("Q: You know sitting here today that Diverse did not install or secure toe boards on the scaffolding on the WC-215 platform, correct? . . . A: Correct.") (form objection omitted).

[23]    Rec. Doc. 91-2, Diverse's memorandum in support, p. 16 of 19 ("It is undisputed that the scaffolding supplied and erected by Diverse did not have toe boards.").

[24]    Rec. Doc. 91-2, Diverse's memorandum in support, p. 17 of 19.

[25]    Exhibit 9, Deposition of Stephen DeLue, p. 309:1-7 ("Q: Did you personally instruct anyone to not install the toeboards on the scaffolding? A: I don't believe I did. Q: Okay. So if someone says that you had gave an instruction to not install those toeboards, that's an incorrect statement? A: Correct.").

[26]    *Id.*

Analysis ("JSA").[27] *Three*, nobody from DLS knew who, if anyone, instructed Diverse not to install the toe boards.[28] And *four,* John Menser—DLS's welder—testified that 4-inch-tall toe boards would not have interfered with getting the job done.[29]

That notwithstanding, even if someone did instruct Diverse not to install the required toe boards—which is denied—that was no excuse for Diverse to deviate from OSHA standards and its own policies and procedures.[30] Diverse's corporate representative, Gerard Boutte, made this clear during his deposition.[31] In fact, Mr. Boutte testified that it would ***never*** be acceptable for Diverse to violate OSHA standards and its own policies and procedures because (1) they are designed to protect, not only Diverse's employees, but also the users of its scaffolding—such as DLS, (2) failure to comply with them increases the risk of accident, injury, or death,[32] and (3)

---

[27]     Exhibit 3, 2020 BSEE panel report, p. 13 ("Q: The [DLS] superintendent provided testimony saying he did not ask to remove toe boards or excluded them from the scaffold build and noted the toe boards were listed in the JSAs.").

[28]     Exhibit 9, Deposition of Stephen DeLue, p. 178:21-23 ("Q: Do you know who told the scaffolding crew not to install the toeboards on the west side scaffold? A: No, I don't."). *See also* Exhibit 8, DLS's corporate deposition, pp. 401:8-402:4 ("Q: Do you know why there were no toe boards on that railing? A: No; I don't. . . . Q: Did anybody at Talos tell you that there was an exception, or a reason, that toe boards were not required for this particular job? A: No; they did not. Q: Did anybody at Diverse tell you there was an exception, or a reason, why toe boards were not required for this particular job? . . . A: No; no one told me.") (form objection omitted) (cleaned up).

[29]     Exhibit 12, Deposition of John Menser, pp. 99:17-100:23 ("Q: Okay. And wha -- what exactly are toe boards? A: Piece of 2-by-4 that -- that's on the edge of the scaffolding. Q: Okay. And how high wa -- How high would the -- doe -- does the toe board extend above the scaffold deck? A: Four inches. Q: Okay. And so it -- - If -- If -- If a toe board had been there, to get the sections of pipe off of the scaffolding, would you have had lifted the piece of pipe over the toe board? A: Yes. Q: So that would have made the job harder; right? . . . A: It's -- It wouldn't have stopped us. Q: You would -- It -- You would've have had to have -- A: We still could have got the piece of pipe over the side.") (form objection omitted).

[30]     Exhibit 7, Diverse's corporate deposition, pp. 77:21-78:9 ("Q: You understand that if scaffolding is supposed to be built or erected a certain manner by company guidelines and industry standards like OSHA, it's not acceptable for Diverse to deviate from their own guidelines or to violate OSHA standards just because their customer told them to. Correct? A: Correct. Q: Because safety is more important than money. Right? A: Definitely. Q: Safety is more important than a happy customer. Correct? A: Definitely.").

[31]     *Id. See also id.* at pp. 220:4-224:21.

[32]     Exhibit 7, Diverse's corporate deposition, pp. 47:21-52:3, p. 71:9-19 ("Q: It would not be acceptable in your mind as the corporate representative of Diverse, if your company was erecting scaffolding in the Gulf of Mexico and because the way the scaffolding was erected, it resulted in violations of either BS[E]E guidelines or other applicable regulatory guidelines like the EPA to the extent they applied? . . . A: Yes, sir.") (form objection omitted); *id.* at pp. 127:7-128:22 ("Q: Similar to the guidelines we have in Exhibit #5, it would be

Diverse, as an expert in scaffolding, should never take such a risk on instructions of a non-Diverse employee who is not knowledgeable about scaffolding.[33]

But Diverse was undeterred. And its failures did not end there.

### 2.    In addition to not installing toe boards, Diverse fails to generate an MOC, stop the work, and report and warn of the hazard.

When there is a deviation from industry standards or policies and procedures in this industry, three things need to happen.

*First*, a document called "management of change" or "MOC" must be generated to address the deviation.[34] The purpose of MOC is to (1) communicate the deviation to everyone to whom it

---

[33]    unacceptable in Diverse's eyes to have their employees deviating or violating from the MOC and/or JSA guidelines. Correct? . . . A: Correct. Q: Deviations of those policies are situations where you were starting to introduce and increase potential hazards in the work place. Correct? . . . A: Correct. Q: Those create situations of an unsafe work place not only for Diverse employees, but for contractors that will be utilizing Diverse equipment like scaffolding. Correct? . . . A: Correct. Q: Those create situations where there's an increased chance of accident, injury, or death. Correct? . . . A: Correct. Q: Which is why it's never acceptable to deviate from those standards, because Diverse does not want to be having a work environment involving their scaffolding where it's unsafe for anybody let alone Diverse employees. Correct? . . . A: Correct.") (form objections omitted).

[33]    Exhibit 7, Diverse's corporate deposition, pp. 220:4-224:21 ("Q: If I were to go out to a Talos platform right now, Mr. Jurgens would have a heart attack if I did that, but if I were to do that and I walked out there and Diverse is out building a scaffold and I looked at you and I said your guy and I said let's violate some OSHA policies today. Would your guys be allowed to just follow my directive? . . . A: No, sir. Q: No. It would be silly. Right? It's silly, because you guys are the experts. Aren't you? A: Yes, sir. Q: You're the scaffolding experts who know not only your own equipment, you know your own policies, and you know OSHA standards. Fair? A: Fair. Q: And so you can't -- you're not just gonna take directives and you're not gonna take -- A: Instruction. Q: You're better than I am man. You're not gonna take instructions from a third party about your company erecting scaffolding in direct violation of your own company policies and OSHA regulations. Fair? . . . A: Fair. Q: Okay and what you're telling me is according to your former employee, Mr. Johnson, is he saying DLS the contractor who's not a scaffolding expert told us to violate company policies and OSHA. That's what you're telling me. Right? . . . A: Correct. Q: If that is true and we'll deal with Mr. Johnson, you would tell me as the corporate representative of Diverse that alone is a major red flag. Right? . . . A: Correct. Q: You'd tell me if that's true, if we take what's in our investigation report as true, that is direct evidence that my employees of Diverse were violating company policies and procedures by taking directives from a non-Diverse employee who's not an expert in scaffolding. Right? . . . A: Correct. Q: You would be telling me, Adam, that's situations where people are starting to cut corners. Right? . . . Correct. Q: And when you cut corners, lives are lost. Right? . . . A: I wouldn't say that. Q: When you cut corners, you're putting safety and the health and safety of others at risk. You would agree with that statement. Fair? . . . A: Yes, sir. Q: What was your answer to that, sir? A: Yes, sir.") (form objections omitted).

[34]    Exhibit 1, Talos' corporate deposition, pp. 381:13-383:2.

applies, and (2) identify and then eliminate the risks created by the deviation.[35] Because its failure

to install toe boards deviated from OSHA guidelines and its own policies and procedures, Diverse

was required to generate an MOC.[36] This is undisputed, and it is also undisputed that Diverse never

did so.[37] According to Mr. Boutte, Diverse's corporative representative, that was "unacceptable."[38]

*Second,* because its failure to install toe boards constituted a deviation from OSHA

guidelines and its own policies and procedures, Diverse was required to exercise its stop work

authority and prevent DLS workers from ever stepping onto its scaffolding.[39] But Diverse didn't

do that either. Mr. Boutte characterized Diverse's failure to exercise its stop work authority as a

"red flag" which should have resulted in Diverse preventing DLS from working on the scaffold at

---

[35]     *Id.*

[36]     Exhibit 7, Diverse's corporate deposition, pp. 152:19-153:7 ("Q: To the extent toe boards weren't installed like we know they weren't on this scaffold leading up to February 17, 2018, that's where we would have to have proof of documentation of a management of change or documented on a JSA. Correct? . . . A: Correct. Q: Again, we have no proof that ever -- of those documents were ever done prior to Mr. Jackson's death. Right? A: Correct.") (form objection omitted). *See also* Exhibit 1, Talos' corporate deposition, pp. 380:24-381:6 ("Q: Now, assuming with me that DSS's [Diverse's] policies and procedures do require toe boards to be erected on scaffolding where there's a risk of materials, equipment or tools falling from a height and striking someone below and DSS [Diverse] deviated form that policy or procedure, would Talos expect DSS [Diverse] to conduct and document a management of change? A: Yes.").

[37]     Exhibit 7, Diverse's corporate deposition, pp. 152:19-153:7. *See also* Exhibit 1, Talos' corporate deposition, pp. 383:3-385:9.

[38]     Exhibit 7, Diverse's corporate deposition, p. 102:1-17 ("Q: Either way, whether it's in a JSA or an MO[C], if there are deviations of set standards, there needs to be documentation confirming the deviation and making sure everyone's on the same page of the deviation. Right? A: Correct. Q: If there are no documented notes of deviations, either through a JSA or an MOC, you would tell me, Adam, as the corporate representative of Diverse, we've got an issue. Right? A: Yes, sir. Q: It's a red flag. Right? A: Yes, sir. Q: It's something that's unacceptable conduct in Diverse's eyes. Right? A: Yes, sir."). *See also id.* pp. 104:5-105:15.

[39]     Exhibit 7, Diverse's corporate deposition, pp. 128:24-129:9 ("Q: That would be a scenario where if the MOC policies and procedures are being violated or the JSA policies or procedures are being violated or not complied with, you as the corporate representative of Diverse would expect your employees to be exercising their stop work authority regarding work involving your scaffolds. Correct? . . . A: Correct.") (form objection omitted). *See also id.* at pp. 131:24-133:3 ("Q: If there was a deviation from set standards in how to build or erect scaffolding and no MOC was done and a proper JSA wasn't done, you'd have told me Adam, it would have been the obligation of Diverse employees at least to stop the job and tell everyone to get off the scaffolding until those issues could be properly addressed. Correct? . . . A: Correct. Q: And if those issues were present, violations of MOC's and JSA's at the time of this incident and there were people working on the scaffolding, you would tell me Adam that's a red flag. Correct? . . . A: Correct. Q: That's a situation where people should not even have been performing work on the scaffolding at the time of Mr. Jackson's death. Correct? . . . A: Correct.") (form objections omitted); *id.* at pp. 102:24-103:24.

the time of the incident.[40] In fact, the risk of missing toe boards causing an injury or death is so high that, during their inspection, the BSEE inspectors refused to even inspect Diverse's scaffolding.[41] So they exercised their stop work authority and demanded that toe boards be installed before they could proceed.[42]

And *third*, upon exercising its stop work authority, Diverse was required to report the lack of toe boards to its own management as well as to Talos, and warn DLS workers—who were actually working on the scaffolding—about the issue.[43] But Diverse didn't do any of this.[44] Instead of reporting and warning about the issue, Diverse decided to keep quiet about it.[45]

---

[40]   *Id.*

[41]   Exhibit 3, 2020 BSEE panel report, p. 21 ("Prior to the BSEE inspectors walking onto the scaffolding, they identified missing toe boards along with two sections of unsecured previously cut pipe. BSEE utilized SWA and requested the pipes be secured prior to accessing the scaffolding as well as going below to the +10 area.").

[42]   *Id.*

[43]   Exhibit 7, Diverse's corporate deposition, pp. 128:24-130:6.

[44]   *Id.* at p. 124:5-16 ("Q: As the corporate representative of Diverse sitting here today in June of 2021, you have no evidence that anyone from Diverse ever reported any unsafe working conditions to members of DLS on the WC-215 from February 11, 2018 until the time of Mr. Jackson's death. Correct? . . . A: Correct."). *See also id.* at pp. 130:8-131:22 ("Q: You have no evidence as the corporate representative of Diverse that any of those steps were taken on the WC-215 prior to Mr. Jackson's death where if the MOC and/or JSA guidelines were deviated from or violated, those issues were being warned to or told to anyone on the rig. Correct? . . . A: Correct. Q: If that was present and taking place at the time of Mr. Jackson's death, you would tell me Adam as the corporate representative of Diverse that's a red flag. Correct? A: Correct. Q: You would tell me Adam, as the corporate representative of Diverse if that was happening on the rig at the time of Mr. Jackson's death work should not have been happening until it was properly adjudicated or handled by either Talos or Diverse. Correct? . . . A: Correct. Q: You would tell me as the corporate representative of Diverse, Adam if that situation was present, no one should have been working on the scaffolding at that time of the accident. Correct? . . . A: Correct.") (form objections omitted); *id.* at pp. 129:20-130:6 ("Q: You'd be expecting them to tell workers or users of your scaffolding that the scaffolding as erected or built is not in compliance with company policy and there's not the appropriate documentation in line for that and so you're not to use the scaffolding until we report this to the proper parties and when we get the proper sign offs and/or changes, if necessary. Correct? . . . A: Correct.") (form objection omitted).

[45]   Exhibit 3, 2020 BSEE panel report, p. 24 ("Diverse personnel did not mention missing toe boards as a hazard in pre-job Safety meetings.").

### 3.      Diverse also fails to "yellow tag" its scaffolding to warn that it was built out of compliance and that it was not safe.

And there is more. Diverse's own policies and procedures require it to inspect its scaffolding "every single day" to ensure compliance with industry standards.[46] During this daily inspection process, Diverse's policies and procedures require it to place a green, yellow, or red tag on the scaffolding indicating whether the scaffolding is—or is not—in compliance.[47] So the purpose of the tag is to warn the scaffold users, such as DLS, of any deviations from safety regulations.[48] Any scaffold that does not have toe boards must be "*yellow* tagged" to warn about any potential hazards associated with its use.[49]

So because the scaffold that Diverse built on Talos' platform was missing toe boards,[50] Diverse's policies and procedures required it to be "yellow tagged."[51] But it wasn't.[52] And

---

[46]    Exhibit 7, Diverse's corporate deposition, pp. 74:5-77:4. *See also* Exhibit 11, Diverse's scaffold policy and procedures, p. 23, ¶N.

[47]    Exhibit 11, Diverse's scaffold policy and procedures, pp. 23-24, ¶N(4)-(8).

[48]    Exhibit 7, Diverse's corporate deposition, pp. 150:24-151:9 ("Q: You would tell me that Adam, the purpose of these tags is that so when people come to use them they can look at the tag and they can be warned or notified of any kind of deviations of how the scaffolding is not gonna comply with OSHA speculations or specifications. Correct? A: Yes, sir. Q: You understand that OSHA does require toe boards. Fair? A: Yes, sir.").

[49]    Exhibit 11, Diverse's scaffold policy and procedures, p. 24, ¶N(6) and p. 29, ¶Q(10) ("Any scaffold that is not completely decked across the laterals (Transoms) due to obstruction or is missing a guardrail or a toe-board, will be 'Yellow Tagged' identifying any potential hazard associated with use.").

[50]    Exhibit 7, DLS's corporate deposition, p. 398:12-16 ("Q: Do you know whether toe boards were used on the scaffolding built by Diverse on the date of the accident? A: I do know that they did not have toe boards on 'em."). *See also* Exhibit ???, Talos' corporate deposition, pp. 379:24-4 ("Q: You know sitting here today that Diverse did not install or secure toe boards on the scaffolding on the WC-215 platform, correct? . . . A: Correct.") (form objection omitted).

[51]    Exhibit 11, Diverse's scaffold policy and procedures, p. 24, ¶N(6) and p. 29, ¶Q(10) ("Any scaffold that is not completely decked across the laterals (Transoms) due to obstruction or is missing a guardrail or a toe-board, will be 'Yellow Tagged' identifying any potential hazard associated with use.").

[52]    Exhibit 7, Diverse's corporate deposition, p. 150:4-22 ("Q: Okay. You would tell me, Adam, by just looking at this document, Nygil Johnson didn't do a complete inspection as the company would require, because we know now there were no toe boards, but the actual scaffolding tag itself doesn't delineate that. Fair? . . . Correct? A: Correct. Q: Okay. You would tell me, Adam, that's a deviation or a failure to comply with Diverse company policies. Fair? . . . A: Correct.") (form objections omitted). *See also id.* at pp. 146:20-147:22.

Diverse's employees knew that this was an issue. In a conversation on Facebook messenger shortly after the incident, Dickie Estelle—Diverse's scaffold foreman—told Mr. Boutte that the situation was "not looking good" because the box indicating that toe boards were missing was not checked off.[53] In other words, by looking at the tag that Diverse placed on the scaffold, DLS workers would ***not*** have known that the scaffold was built out of compliance with OSHA standards and would have been misled into thinking that the scaffold was safe.[54]





[55]

---

[53]      Exhibit 7, Diverse's corporate deposition, pp. 21:21-24:3.

[54]      Exhibit 7, Diverse's corporate deposition, pp. 151:10-152:1 ("Q: You would agree that users of this scaffold on February 17, 2018 such as DLS employees, if they were to look at this tag like they're required to, it would not tell them that the scaffolding has been erected or built out of compliance with OSHA. Correct? . . . A: Correct. Q: It would -- it would mislead a user of the scaffold to think okay, if OSHA -- it would mislead a user of the scaffold that toe boards were not required. Fair? . . . A: Correct.") (form objections omitted).

[55]      Exhibit 13, Estelle's Facebook message to Boutte, p. 1. *See also* Exhibit 7, Diverse's corporate deposition, pp. 146:10-147:22 ("Q: Okay. As the corporate representative of Diverse, Exhibit #8 are a front and back picture of the tag on the scaffolding that was involved in this incident. Correct? . . . Correct? A: Yes, sir. Q: And when Mr. Estelle actually took those photos, he sent not only the photos to you, but he actually sent a statement to you in the -- in the chat. Correct? A: Yes, sir. Q: He said, and I quote, 'not looking good G). Did I read that correctly? A: Yes, sir. Q: He then said he didn't check off the missing toe board. Correct? A: Yes, sir. Q: He's telling you after finding the actual tag for this scaffold that the hazard related to anything that is not present on the scaffolding shows that there was no objective or outward sign warning that toe boards were missing from the scaffold on the actual scaffold checklist. Correct? . . . Correct? A: As far as what is shows. Yes, sir.") (form objections omitted).

And that was particularly problematic considering that (1) DLS expected Diverse to build the scaffolding in compliance with safety regulations[56] and warn about any dangerous conditions,[57] and (2) Diverse knew that that was expected from it.[58] Yet, Diverse still violated OSHA guidelines and its own policies and procedures and put DLS workers, including Mr. Jackson, in harm's way.

### D. Diverse's failures have practical consequences, as evident from the pipes found on the bottom of the Gulf of Mexico; their failures helped cause this incident.

Diverse's failures to install toe boards on the scaffolding, and to warn about it, manifested in practice. Indeed, due to the lack of toe boards, several pieces of pipe rolled over 30 feet from scaffolding and into the Gulf of Mexico only one day before Mr. Jackson's death.[59] Talos' corporate representative agreed that—judging by the number of firewater pipes found in the Gulf—this was not a "one-off" incident where a firewater pipe had fallen to the ground.[60] Rather, this happened "on a regular basis" during the pipe-removal operation.[61] So it was only a matter of time when one of these free-falling pipes would actually find its target.

---

[56] Exhibit 8, DLS's corporate deposition, p. 397:1-6 ("Q: Did DLS expect Diverse to build the scaffolding correctly? . . . A: Yes.") (form objection omitted). *See also id.* at pp. 390:4-19 ("Q: All right. If Talos has a particular safety rule, or guideline, did DLS expect Talos would follow that safety rule, and guideline, at the time of this accident? . . . A: Yes. Q: Did it rely on Talos to do that? . . . A: Yes. Q: Same for DSS [Diverse]? A: Yes.") (form objections omitted).

[57] *Id.* at pp. 390:22-7 ("Q: . . . If Talos knew there was a dangerous condition on the platform on the date of the accident, did DLS rely on Talos to advise it -- to advise DLS -- of that dangerous condition? . . . A: Yes. Q: Same for DSS [Diverse]? A: Yes.") (form objection omitted).

[58] Exhibit 7, Diverse's corporate deposition, p. 47:14-20 ("Q: And you understand that your customers and people who utilize your platforms are gonna rely on you as experts to be able to use a safe and properly installed and equipped and erected scaffold when performing services. Correct? A: Yes, sir.").

[59] Exhibit 3, 2020 BSEE panel report, at TAL02616 - Safety Alert.

[60] Exhibit 1, Talos' corporate deposition, p. 239:7-15 ("Q: You'd agree with me that whenever the divers went down, they found numerous sections of pipe below the WC-215, fair? A: Yes. Q: Meaning that this was not just a one-off incident where pipe had fallen from above down below but that this had been happening on a regular basis to some extent, fair? A: To some extent, yes.").

[61] *Id.*

Following Mr. Jackson's death, the BSEE conducted its investigation on Talos' platform. And it specifically found that Diverse's failure to install toe boards on the scaffolding was a contributing cause of the incident.[62] The reason, of course, makes perfect sense. Without toe boards in place to prevent pipes from falling or rolling over to the deck below, ***no one*** should have been allowed to ever set foot on Diverse's scaffold.[63] That is, by not allowing the job to proceed, toe boards could have singlehandedly prevented this accident.[64] Even Mr. Boutte, Diverse's corporate representative, confirmed this to be true.[65] In plain English, he testified as follows:

Q:    That's a situation where people should not even have been performing work on the scaffolding at the time of Mr. Jackson's death. Correct?
. . .

A:    Correct.

Q:    You understand that there was work being performed on the scaffolding at the time of the accident. Right?

A:    Correct.

---

[62]    Exhibit 3, 2020 BSEE panel report, p. 23. *See also* Exhibit 14, Rex Anderson's report, p. 3.

[63]    Exhibit 1, Talos' corporate deposition, pp. 390:24-12 ("Q: So this job should not have even been -- hindsight being 20/20, this job should not have gone forward until, in part, the toe boards had been installed by Diverse. Fair? . . . A: Or an MOC completed, reviewed and approved with all proper channels, yeah. Q: Let me re-ask that question. With hindsight being 20/20, this job should never have proceeded in the first place unless, one, Diverse installed the toe boards or, two, went through the appropriate management of change process to approve the use of this scaffolding without the toe boards, correct? A: That is correct.") (form objection omitted). *See also id.* at p. 393:1-15; Exhibit 7, Diverse's corporate deposition, pp. 132:11-133:3 ("Q: And if those issues were present, violations of MOC's and JSA's at the time of this incident and there were people working on scaffolding, you would tell me Adam that's a red flag. Correct? . . . A: Correct. Q: That's a situation where people should not even have been performing work on the scaffolding at the time of Mr. Jackson's death. Correct? . . . A: Correct.") (form objections omitted).

[64]    Exhibit 8, DLS's corporate deposition, pp. 402:25-403:9 ("Q: Do you think something like a toe board could have prevented a piece of pipe from rolling, or being kicked off, a platform like this? . . . A: Possibly could have.") (form objections omitted). *See also* Exhibit 12, Deposition of John Menser, p. 135:12-17 ("Q: Mr. Menser, in reviewing your statement, I think you said that you didn't know of anything that DSS [Diverse] did wrong in causing or contributing to this accident; is that accurate? A: I mean just the scaffold being built wrong probably helped contribute.").

[65]    Exhibit 7, Diverse's corporate deposition, p. 153:8-25 ("Q: Based off of your prior admissions under oath, subject to perjury, no one should have been working on this scaffolding on the day of this incident because there was no documented MOC or JSA showing that it was approved to have no toe boards. Correct? . . . A: Correct. Q: Obviously if the DLS workers are not working on the scaffold on February 17, 2018, Mr. Jackson is not killed. Correct? . . . A: Correct.") (form objections omitted).

Q:     You understand an object fell from that scaffolding striking Mr. Jackson in the head and killing him. Correct?

       . . .

A:     Correct.

Q:     You'd agree with me, sir, that if no one's working on the scaffolding at the time that Mr. Jackson's below and no one's cutting pipe, this accident doesn't happen. Correct?

       . . .

A:     Correct.[66]

                              *       *       *

Q:     Okay. I'm gonna tell you that, because it's not really a disputed fact. An object, a piece of pipe, fell from the scaffolding that we're talking about and it fell down and struck Mr. Jackson in the head. Okay.

       . . .

Q:     Okay. You with me?

A:     Yes, sir.

Q:     You would tell me, Adam, based off of the information you have now this incident never should have happened, because the workers never should have been there in the first place, because the MOC's and JSA's weren't complied with. Correct?

       . . .

A:     Correct.[67]

Mr. Boutte's testimony, without more, defeats Diverse's motion.

---

[66]   *Id.* at pp. 132:20-134:1 (form objections omitted).

[67]   *Id.* at pp. 154:19-155:15.

### III.   Law and Argument

### A.   Summary judgment is proper only if there are no disputed material facts.

On summary judgment, the burden is on the movant to show that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law.[68] "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response."[69] The nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor."[70] And "[e]ven if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'"[71]

### B.   An independent contractor owes a duty to another independent contractor's employees to exercise reasonable care and to refrain from creating a hazardous condition.

The parties do not dispute the law that governs this case. In Louisiana, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."[72] Louisiana employs a "duty-risk analysis" to determine whether to impose liability.[73] The analysis consists of five elements, including (1) duty, (2) breach, (3) cause in fact, (4) legal cause,

---

[68]    Fed. R. Civ. P. 56(a); *see also Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994).

[69]    *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

[70]    *Singleton v. Fieldwood Energy, LLC,* 2016 WL 3902599, at *2 (E.D. La. 2016) (internal citations omitted).

[71]    *Id.* (internal citations omitted).

[72]    *Fornah v. Schlumberger Tech. Corp.,* 737 F. App'x 677, 681 (5th Cir. 2018) (citing La. C.C. art. 2315(A)).

[73]    *Id.* (internal citation omitted).

and (5) damages.[74] With the second and fifth elements being undisputed,[75] Diverse's motion centers on the duty and causation elements. Accordingly, this opposition has the same focus.

Whether a defendant owes a duty "is a threshold question and is a question of law."[76]  But "the particular facts and circumstances of each individual case determines the extent of the duty and the resulting degree of care necessary to fulfill the duty."[77] Generally, an independent contractor does not owe a special duty to protect the employee of another independent contractor.[78] Rather, "the duty imposed upon fellow independent contractors is 'that imposed on all persons, the exercise of reasonable care.'"[79] In addition to exercising reasonable care, an independent contractor owes a duty to another independent contractor's employees to "refrain from creating an unreasonable risk of harm or a hazardous condition."[80]

### C.    Diverse's attempt at summary judgment is doomed by the BSEE finding of causation and the testimony of its own corporate representative.

Diverse argues that summary judgment is proper here because there are allegedly "no facts to support liability against [it]."[81] But this notion is divorced from reality. It seems that it is the plaintiffs' claims against **Talos** that shaped Diverse's flawed understanding of the plaintiffs'

---

[74]    *Id.* (internal citation omitted).

[75]    The fact that Mr. Jackson died as a result of this incident takes the damages element out of dispute. Also, Diverse does not dispute that it failed to install toe boards on its scaffolding, in violation of OSHA standards and its own policies and procedures. *See* Rec. Doc. 91-2, Diverse's memorandum in opposition, p. 16 of 19.

[76]    *Fornah,* 737 F. App'x at 681 (internal citations omitted). *See also Harris v. Pizza Hut of Louisiana, Inc.,* 455 So. 2d 1364, 1371 (La. 1984).

[77]    *Socorro v. City of New Orleans,* 579 So. 2d 931, 938 (La. 1991).

[78]    *McCarroll v. Seatrax Servs., Inc.,* 2013 WL 3872219, at *4 (E.D. La. 2013) (citations omitted).

[79]    *Id.* (internal citations omitted).

[80]    *McCarroll v. Wood Grp. Mgmt. Servs., Inc.,* 561 F. App'x 407, 410 (5th Cir. 2014). *See also Lafont v. Chevron, U.S.A., Inc.,* 593 So. 2d 416, 420 (La. App. 1st Cir. 1991) ("Under Louisiana jurisprudence generally, a contractor owes an obligation toward third persons to refrain from creating a hazardous condition.").

[81]    Rec. Doc. 91, Diverse's motion for summary judgment, p. 1 of 2.

claims against *it*. But the plaintiffs' allegations against these two defendants are different. And even a cursory review of this opposition should be enough to reveal those differences.

Indeed, plaintiffs do not argue that Diverse—like Talos—had a contract with DLS. Or that Diverse—like Talos—played a role in (1) supervising DLS workers in their pipe-removal activities, (2) providing DLS with tools, training, and job knowledge, (3) selecting the tools for the job and ensuring that they were safe, or (4) determining the number of DLS's crew members.[82] So the vast majority of Diverse's motion relies on the facts that do not pertain to the plaintiffs' allegations against it. Rather, the plaintiffs fault Diverse for failing to install toe boards—in violation of OSHA standards and its own policies and procedures—and to subsequently warn about it. And according to its own corporate representative as well as the BSEE, Diverse's failures were—in fact—a contributing factor of this incident.

### 1.   By failing to install toe boards, do an MOC, exercise its stop work authority, and report and warn about the issue, Diverse created an unreasonable risk of harm or a hazardous condition.

In arguing that the plaintiffs have no facts to support its negligence claim against it, Diverse goes to great lengths to ignore the record evidence. And the effort is telling, especially considering that this evidence is overwhelming—and ***undisputed***.

Specifically, it is undisputed that Diverse should have never built the scaffolding without toe boards.[83] Yet, in violation of its own policies and procedures[84]—as well as OSHA

---

[82]   Rec. Doc. 91-2, Diverse's memorandum in support, pp. 7-8 and pp. 11-of 19.

[83]   Exhibit 3, 2020 BSEE panel report, p. 24 ("Per Diverse Policy and Procedure, the scaffolding should not have been built without toe boards or two access area."). *See also* Exhibit 8, DLS's corporate deposition, pp. 400:18-401:7 ("Q: All right. Were there any toe boards? A: No. Q: Based on your review of this policy, should there have been toe boards? . . . A: Yes; they should have toe boards.") (form objections omitted).

[84]   Exhibit 7, Diverse's corporate deposition, p. 152:11-18. *See also* Exhibit 11, Diverse's scaffold policy and procedures, p. 19, ¶2(c) ("Where there is a danger of tools, materials or equipment falling from a height and striking employees below the following applies: . . . A toe board ***shall*** be erected along the edge of platforms . . .") (emphasis added); Exhibit 3, 2020 BSEE panel report, p. 13.

guidelines[85]—Diverse did just that.[86] And Diverse concedes the point.[87] But the laundry list of Diverse's failures did not end there.

It is also undisputed that, after failing to erect toe boards, Diverse also failed to (1) generate an MOC to identify and eliminate the risks created by the lack of toe boards[88]—despite being required to do so,[89] (2) exercise its stop work authority and prevent DLS workers from ever getting on the scaffold[90]—despite being required to do so,[91] and (3) report the lack of toe boards to its own and Talos' management and warn DLS workers about the issue[92]—despite being required to do so.[93]   Diverse's own corporate representative, Mr. Boutte, labeled these failures as "unacceptable"[94] and as being a "major red flag" in Diverse's practice.[95]

If that weren't enough, the evidence shows that its own policies and procedures required Diverse to inspect the scaffold every single day to ensure compliance with industry standards[96]—

---

[85]   Exhibit 7, Diverse's corporate deposition, p. 152:11-18 ("Q: You'd agree with me toe boards are required by OSHA and company policy. Correct? . . . A: Correct. Q: Correct? A: Yes, sir.") (form objection omitted).

[86]   Exhibit 8, DLS's corporate deposition, p. 398:12-16. *See also* Exhibit 1, Talos' corporate deposition, pp. 379:24-4.

[87]   Rec. Doc. 91-2, Diverse's memorandum in support, p. 16 of 19 ("It is undisputed that the scaffolding supplied and erected by Diverse did not have toe boards.").

[88]   Exhibit 7, Diverse's corporate deposition, pp. 152:19-153:7. *See also* Exhibit 1, Talos' corporate deposition, pp. 381:1-385:9.

[89]   Exhibit 7, Diverse's corporate deposition, pp. 152:19-153:7. *See also* Exhibit 1, Talos' corporate deposition, pp. 380:24-381:6.

[90]   Exhibit 7, Diverse's corporate deposition, pp. 128:24-129:9, pp. 131:24-133:3, and pp. 102:24-103:24.

[91]   *Id.*

[92]   *Id.* at p. 124:5-16, pp. 130:8-131:22, and pp. 129:20-130:6.

[93]   *Id.* at pp. 128:24-130:6. *See also* Exhibit 3, 2020 BSEE panel report, p. 24 ("Diverse personnel did not mention missing toe boards as a hazard in pre-job Safety meetings.").

[94]   Exhibit 7, Diverse's corporate deposition, p. 102:1-17 and pp. 104:5-105:15.

[95]   *Id.* at pp. 220:4-224:21 and pp. 131:24-133:3.

[96]   *Id.* at pp. 74:5-77:4. *See also* Exhibit 11, Diverse's scaffold policy and procedures, p. 23, ¶N.

and to tag it.[97] Because Diverse's scaffold was missing toe boards, these same policies and procedures required Diverse to "yellow tag" it in order to warn DLS workers about any potential hazards associated with its use.[98] But Diverse didn't "yellow tag" the scaffold.[99] So, by looking at Diverse's tag, DLS workers could not have known that the scaffold was built out of compliance with OSHA standards.[100] And this misled them into believing that the scaffold on which they were operating was safe.[101] This is particularly disconcerting considering that DLS expected Diverse to (1) build its scaffolding in compliance with safety regulations,[102] and (2) warn DLS workers about any dangerous conditions.[103] And, to make matters worse, Diverse knew that this was expected from it.[104] But Diverse was undeterred.

These failures are evidence that Diverse did not only fail to exercise reasonable care in building its defective scaffolding—but that it also created an unreasonable risk of harm/a hazardous condition by keeping quite about it. To be sure, each of Diverse's omissions—independently, but especially in combination—directly placed Mr. Jackson's life, as well as the life of other DLS workers, in danger. And this is exactly why the law charges Diverse with a duty

---

[97]    Exhibit 11, Diverse's scaffold policy and procedures, pp. 23-24, ¶N(4)-(8). *See also* Exhibit 7, Diverse's corporate deposition, pp. 150:24-152:1.

[98]    Exhibit 11, Diverse's scaffold policy and procedures, p. 24, ¶N(6) and p. 29, ¶Q(10).

[99]    Exhibit 7, Diverse's corporate deposition, p. 150:4-22 and pp. 146:20-147:22.

[100]   Exhibit 7, Diverse's corporate deposition, pp. 151:10-152:1.

[101]   *Id.*

[102]   Exhibit 8, DLS's corporate deposition, p. 397:1-6 and pp. 390:4-19.

[103]   *Id.* at pp. 390:22-7.

[104]   Exhibit 7, Diverse's corporate deposition, p. 47:14-20.

of care.[105] At the very least, a genuine factual dispute remains on the issue sufficient to undermine Diverse's attempt at summary judgment.

> ### 2. Diverse's failures contributed to this incident; its motion defies the testimony of its own corporate representative and the BSEE findings.

Following Mr. Jackson's death, the BSEE conducted an investigation on Talos' platform. It specifically found that Diverse's failure to install toe boards on the scaffolding ***was*** a contributing cause of the incident.[106] Thus, the BSEE conclusion, alone, creates a genuine issue for the trier of fact and defeats Diverse's motion.

And the reasoning behind the BSEE's finding makes perfect sense. Because Diverse's scaffold lacked toe boards, no DLS employee should have ever ***stepped foot*** on the scaffold to begin the pipe-removal activities—thereby completely eliminating any risk of injury or death.[107] But the reasoning seems to make sense to everyone, except to Diverse.[108]  Indeed, even Diverse's corporate representative, Mr. Boutte, admitted during his deposition—on at least ***four*** separate occasions—that the incident should have never happened.[109] Why?   Because Diverse was supposed to ensure that no DLS worker ever climbed Diverse's faulty scaffold and began the pipe-

---

[105]   *McCarroll v. Seatrax Servs., Inc.,* 2013 WL 3872219, at *4 (E.D. La. July 24, 2013) (internal citations omitted); *McCarroll v. Wood Grp. Mgmt. Servs., Inc.,* 561 F. App'x 407, 410 (5th Cir. 2014); *Lafont v. Chevron, U.S.A., Inc.,* 593 So. 2d 416, 420 (La. Ct. App. 1991).

[106]   Exhibit 3, 2020 BSEE panel report, p. 23. *See also* Exhibit 14, Rex Anderson's report, p. 3.

[107]   Exhibit 7, Diverse's corporate deposition, pp. 131:24-133:3, 128:24-129:9, pp. 102:24-103:24, and p. 153:8-25.

[108]   Exhibit 8, DLS's corporate deposition, pp. 402:25-403:9 ("Q: Do you think something like a toe board could have prevented a piece of pipe from rolling, or being kicked off, a platform like this? . . . A: Possibly could have.") (form objections omitted). *See also* Exhibit 12, Deposition of John Menser, p. 135:12-17 ("Q: Mr. Menser, in reviewing your statement, I think you said that you didn't know of anything that DSS [Diverse] did wrong in causing or contributing to this accident; is that accurate? A: I mean just the scaffold being built wrong probably helped contribute.").

[109]   Exhibit 1, Talos' corporate deposition, pp. 390:24-12 and p. 393:1-15; Exhibit 7, Diverse's corporate deposition, pp. 131:24-133:3, 128:24-129:9, pp. 102:24-103:24, and p. 153:8-25.

removal operation without the proper warning.[110] And had Diverse done so, Mr. Jackson would have never been in a position to be struck by a pipe.

In response, Diverse claims that the mere presence of toe boards would not have prevented the accident because the rope securing the pipe parted.[111] But that argument fails. Even if the mere **presence/absence** of toe boards would not have prevented the accident—which is denied— Diverse's **warning** about it would. Had Diverse acted to correct its error in construction of the scaffold, instead of remaining silent, that would have entirely halted the pipe-removal operation and eliminated the need for Mr. Jackson to be present at the platform in the first place.

On balance, Diverse's motion is directly at odds with the testimony of its own corporate representative. Coupled with the BSEE finding of causation, Mr. Boutte's testimony is—without more—fatal to Diverse's efforts to secure dismissal on summary judgment.

### 3.  Diverse's attempt to blame DLS and hide behind easily distinguishable jurisprudence further reveals the weakness of its argument.

As noted, Diverse admits that it violated OSHA standards and its own policies and procedures by failing to erect toe boards on the scaffolding. But Diverse argues that it did so because DLS's construction foreman, Mr. DeLue, instructed it to build a scaffold without any toe boards.[112] The argument, however, rests on the thinnest of reeds.

Indeed, Mr. DeLue expressly testified that (1) he never gave such instructions, and (2) any statement to the contrary would be inaccurate.[113] But even if Mr. DeLue did so instruct Diverse,

---

[110]    *Id.*

[111]    Rec. Doc. 91-2, Diverse's memorandum in support, p. 17 of 19 ("The presence or absence of toe boards on the scaffolding had nothing to do with the accident involving Walter Jackson.").

[112]    *Id.* at p. 16 of 19.

[113]    Exhibit 9, Deposition of Stephen DeLue, p. 309:1-7 ("Q: Did you personally instruct anyone to not install the toeboards on the scaffolding? A: I don't believe I did. Q: Okay. So if someone says that you had gave an instruction to not install those toeboards, that's an incorrect statement? A: Correct.").

that would have—under no circumstances—excused Diverse's violation of industry standards and the company's policies and procedures.[114] In fact, had Mr. DeLue so instructed Diverse and Diverse obliged, that—according to Mr. Boutte—would have been even ***stronger*** evidence of Diverse's negligence.[115] This is so because Diverse is a scaffolding expert and its employees should never violate industry standards and create hazards on advice of third parties.[116]

Grasping at straws, Diverse also argues that the reason why the lack of toe boards would not have played a role in this incident is because DLS workers allegedly pushed the pipe off the scaffolding in order to lower it to the deck below.[117] The argument, however, is self-destructive. Even if it were true that DLS workers pushed the pipe to lower it down, it is exactly the ***presence of toe boards*** that would have prevented them from doing so. Especially considering that the toe boards are designed to withstand, without failure, a force of at least 50 pounds.[118]

Finally, in a last-ditch effort, Diverse cites *Blaze v. McMoran Oil & Gas, LLC*[119] and says it "mandates that [it] be released from this litigation."[120] But that couldn't be further from the truth.

In *Blaze*, the plaintiff was injured on a platform after handling a pup joint in an elevated basket during inclement weather, at night.[121] Prior to the incident, the owner of the platform hired various independent contractors for plug and abandonment ("P&A") operations—including the plaintiff's employer, Superior Energy Services, LLC. Under the parties' contract, Superior was to

---

[114] Exhibit 7, Diverse's corporate deposition, pp. 77:21-78:9 and pp. 220:4-224:21.

[115] *Id.*

[116] *Id. See also id.* at pp. 47:21-52:3, p. 71:9-19, and pp. 127:7-128:22.

[117] Rec. Doc. 91-2, Diverse's memorandum in support, pp. 17-18 of 19.

[118] Exhibit 15, OSHA regulations, p. 3 of 4.

[119] *Blaze v. McMoran Oil & Gas LLC,* 2018 WL 4925666 (W.D. La. 2018).

[120] Rec. Doc. 91-2, Diverse's memorandum in support, p. 15 of 19.

[121] *Blaze*, 2018 WL 4925666, at *1.

furnish personnel and equipment for the operations as well as its own supervisor to oversee its workers. Another independent contractor hired by the platform-owner was Danos, LLC—and its job was to provide contract production and/ labor to assist with operating the platform. Danos (1) had no custody or control of the work basket or any equipment the plaintiff was using at the time of the accident, (2) did not hire, train, or have any contractual relationship with the plaintiff or his employer, and (3) had only one supervisor on-site who had no experience whatsoever in P&A work. And, ***unlike here***, there was no evidence that Danos "knew or should have known about any alleged unsafe work condition" on the night of the incident.[122] When Danos moved for summary judgment on the ground that it did not owe a duty to the plaintiff and that no Danos employee was "involved in any relevant events leading up to" the incident, the court granted it.[123]

But this case is worlds apart from *Blaze*. First, not even Diverse can claim that it had no involvement "in any relevant events leading up to" Mr. Jackson's death. Diverse built the scaffold that was *essential* to the pipe-removal project and without which DLS's work would not have even been possible. So, unlike Danos in *Blaze*, Diverse here was not nearly as far removed from the relevant events that led up to this incident. And second, unlike Danos in *Blaze,* Diverse was not only aware of the unsafe work condition. Diverse ***created*** it.

The jury could easily find that Diverse's negligent acts—at least partly—contributed to this incident. So Diverse's motion should be denied. To put a fine point on it, if in order to grant summary judgment this Court has to ignore the fact that—but for Diverse's failures, Mr. Jackson wouldn't have even been present under the scaffold deck—summary judgment is improper.[124]

---

[122] *Id.*

[123] *Id.* at *4.

[124] *Smith v. Bd. of Commissioners of La. Stadium and Exposition Dist.*, 372 F. Supp. 3d 431, 438 (E.D. La. 2019).

## IV.   CONCLUSION

Diverse's motion is brimming with genuine issues of fact. It should be denied.

Respectfully submitted,

/s/     Kyle Findley
J. Kyle Findley (#34922)
kfindley@arnolditkin.com
John G. Grinnan (*Pro Hac Vice* granted)
jgrinnan@arnolditkin.com
**ARNOLD & ITKIN LLP**
6009 Memorial Drive
Houston, TX 77007
Telephone: 713-222-3800
Facsimile: 713-222-3850
e-service@arnolditkin.com

Zachary P. McFarlane (#38832)
zmcfarlane@zehllaw.com
Michael E. Streich
mstreich@zehllaw.com
**ZEHL & ASSOCIATES, PC**
2700 Post Oak Blvd., Suite 1000
Houston, TX 77056
Telephone: 713.491.6064
Facsimile: 713.583.1492

**ATTORNEYS     FOR     VANTRECE
JACKSON**

-AND-

Michael Cox (# 22026)
mike.cox@coxcoxfilo.com
COX, COX, FILO, CAMEL & WILSON LLC
723 Broad Street
Lake Charles, LA 70601
Tel: 337.436.6611
Fax: 337.436.9541

**ATTORNEYS FOR ANIKA WARNER**

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon all counsel of record this 10th day of February, 2022 by e-filing it into the CM/ECF system, which will automatically deliver a copy to all counsel.

/s/     Kyle Findley
Kyle Findley

25