UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **ANIKA WARNER** | **CASE NO. 2:18-CV-01435 LEAD** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **TALOS E R T  L L C ET AL** | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM ORDER

Before the court are Motions to Strike [docs. 103, 104, 105, 106] filed by defendant Talos ERT LLC ("Talos"), seeking to exclude the reports and opinion testimony of witnesses Martin Gee, Stan Smith, Rex Anderson, and Edward Ziegler under the standards set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiffs oppose the motions. Docs. 116–19.

### I.
#### BACKGROUND

This suit arises from the death of Walter Jackson in an accident on February 17, 2018. Jackson was employed as a rigger by DLS, LLC ("DLS") on an oil and gas production platform owned and operated by Talos ERT, LLC ("Talos") and situated on the Outer Continental Shelf off the coast of Louisiana. Plaintiffs, who are Jackson's surviving spouse and the guardian of his minor child, allege that he and other DLS employees were attempting to lower sections of pipe that were to be removed from the platform when one of the sections came loose and struck Jackson, resulting in his death. Doc. 1, ¶¶ 4, 6. They

also allege that the injuries were caused by unsafe scaffolding provided by Diverse Scaffolding, LLC ("Diverse") and by deficient safety instructions. *Id.* at ¶ 5.

Plaintiffs filed separate suits for negligence against Diverse and Talos, which the court consolidated. Doc. 19. Both defendants filed motions for summary judgment. Docs. 91, 93. By separate rulings the court has granted Diverse's motion and denied Talos's. Several motions in limine and *Daubert* motions are also pending before the court. Docs. 103–10. This opinion relates to Talos's *Daubert* motions, which seek exclusion of the following experts: Martin Gee [doc. 103], Rex Anderson [doc. 105], and Edward Ziegler [doc. 106], who have all offered opinions on Talos's compliance with federal safety standards on the pipe removal project; and Stan Smith [doc. 104], an economist who will opine on the value of certain losses resulting from Walter Jackson's death. Plaintiffs oppose all of the motions. Docs. 116–19.

## II.
## LAW & APPLICATION

### A. Governing Law

The trial court serves as gatekeeper in determining the admissibility of expert testimony, by making an initial determination of whether the expert's opinion is relevant and reliable. *See Daubert*, 509 U.S. at 589. This gatekeeping function extends to all expert testimony, whether scientific or not. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). Accordingly, Federal Rule of Evidence 702 provides that the court must consider the following three requirements on challenges to experts: 1) qualifications of the expert witness; 2) relevance of the proposed testimony; and 3) reliability of the principles

and methodology on which the testimony is based.[1] The proponent of the expert testimony bears the burden of proving its admissibility, by a preponderance of the evidence. *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

The trial court has broad latitude in determining the admissibility of expert testimony. *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). Rejection of expert testimony is the exception rather than the rule, and the court's role as gatekeeper "does not replace the traditional adversary system and the place of the jury within the system." *Johnson v. Samsung Electronics Am., Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011); *Scordill v. Louisville Ladder Grp., LLC*, 2003 WL 22427981, at *3 (E.D. La. Oct. 24, 2003). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Scordill*, 2003 WL 22427981 at *3 (quoting *Daubert*, 509 U.S. at 596).

B. Application

1. Liability Experts

Pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1348(d), and applicable regulations, the Bureau of Safety and Environmental Enforcement ("BSEE") is authorized to regulate oil and gas exploration, production, and development operations on

---

[1] The *Daubert* Court identified several additional factors for assessing whether the expert's methodology is valid and reliable, including whether the expert's theory had been tested and subjected to peer review, the known or potential error rate for the expert's theory or technique, the existence and maintenance of standards and controls, and the degree to which the technique or theory has been generally accepted in the scientific community. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 275 (5th Cir. 1998). However, the same standards cannot be applied to all possible fields of expertise. Accordingly, the *Daubert* analysis is necessarily flexible and fact-specific. *Kumho*, 526 U.S. at 150.

the Outer Continental Shelf. 30 C.F.R. § 250.101. Experts Gee, Anderson, and Ziegler have all issued reports describing Talos's alleged failure to exercise due care in this matter, based on industry standards including those established by the BSEE. Talos moves to strike these reports and exclude the experts from testifying on the grounds that they offer impermissible legal conclusions about Talos's conduct, and that these conclusions are at any rate flawed because they are based on federal regulation rather than the Louisiana law applicable to this matter. Accordingly, Talos maintains that the expert testimony and reports fail the balancing test set forth under Federal Rule of Evidence 403 because their probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.

Talos does not challenge the training, qualifications, or methodology of any of these witnesses. Gee, Anderson, and Ziegler all have decades of experience in offshore/onshore oil and gas and have been accepted as experts in other courts on, *inter alia*, industry safety standards. Gee's report provides the following conclusions:

> 1. It is our opinion that the death of Mr. Jackson was due to the failure of TALOS, the platform owner, to properly plan the pipe removal operations which consequently led to an unsafe pipe removal operation.
> 2. It is our opinion that TALOS did not assess the hazards of the pipe removal operation and had not documented or maintained the documentation as required by BSEE 30 CFR 250.1911. If they had then the dangers posed by using unrated, worn and damaged manilla rope for lowering pipe sections down to an area of the platform that was not properly controlled would have been recognized.
> 3. It is our opinion that TALOS did not ensure the pipe removal operation was covered by written procedures as required by BSEE 33 CFR 250.1913
> 4. It is our opinion that TALOS allowed a dedicated firewatcher to lower cut sections of pipe at variance with Talos policies and generally accepted offshore industry practice.

>    5. It is our opinion that TALOS did not reassess the changed work arrangements when the position of the snatch block changed and the gas cutting slag stream caused the two riggers to change positions.
>    6. It is our opinion that TALOS failed to clearly define the landing zone beneath the work area where DLS workers were cutting/lowering sections of firewater pipe. The workers receiving the lowered pipework should have been prohibited from entering the landing zone when lowering operations and/ or cutting operations were taking place.
>    7. It is our opinion that TALOS allowed sections of cut pipe to be lowered to the landing area below without ensuring that the person controlling the lowering had a positive visual confirmation that it was clear.
>    8. It is our opinion that TALOS did not ensure that there was a procedure for inspecting the manilla rope prior to use.
>    9. It is our opinion that TALOS did not ensure that their PIC/ UWA properly carried out the JSA prior to the commencement of the operation which was consequently not effective in capturing all the potential risks and identifying steps to eliminate them.
>    10. It is our opinion that TALOS has a significant history of serious accidents and BSEE safety and pollution rules violations stretching back many years, including three fatalities.
>    11. It is our opinion that TALOS failed to conduct a hot work permit for cutting operations that were being carried out on the day of the incident involving Mr. Jackson.
>    12. It is our opinion that TALOS and specifically their PIC, Mr. Jeremy Bourque, failed to adequately control the safety of operations on the WC 215 platform, resulting in the situation which led to the death of Mr. Jackson.
>    13. It is our opinion that DSS failed to properly install, inspect and maintain the hanging scaffolding which was erected for the piping removal job. This led to the omission of toe boards on the scaffolding despite documentation on site which indicate the toe boards were installed.
>    14. It is our opinion that TALOS failed to provide the tools, training or equipment to enable the pipe removal job to be accomplished in a safe manner.

Doc. 116, att. 1, pp. 12–13. He also concludes that Jackson did not "violate any regulations, requirements or industry standard practices or procedures that led to his death on 17th February 2018." *Id.* at 14.

Anderson states that he was retained by plaintiff Anika Warner as an expert in HSE and offshore security, with special emphasis on industry standards. Doc. 117, att. 1, p. 1. He provided the following conclusion in his report:

> Ultimately, from the testimony, documents and prior incidents reviewed, it is my opinion that there was a culture on the Platform that this job, and others like it, were not important enough to give the minimum safety attention and oversight required to perform this task. It is assumed that other jobs may have also been performed with lack of oversight, adding to the culture issue. Had Talos leadership played a more integral part in the operation, as specified in their own SWP and JSA process, the probability of this incident being prevented would have increased.

Doc. 117, att. 1, p. 5.

Finally, Ziegler offers the following opinions relevant to causation and industry standards:

> 6.1. I formed opinions to a reasonable degree of and to other high standards as required to and for engineering, oil and gas, and safety industry certainty.
> 6.2. BSEE determined the probable cause of the incident was the ½-inch manila rope parting and dropping the heavy piece of pipe. Talos controlled and allowed the use of that rope and that work process---as the authority with overall safety responsibility at the facility---as the Talos JSA form recites.47
> 6.3. The undocumented ½-inch manila rope was in use and was used without a proper mechanical material handling device or system as Talos through its PIC/UWA allowed that process to occur.
> 6.4. Talos: (a) did not properly implement, use, or enforce the PIC/UWA, SEMS, SIMOPS, or BSEE-regulated unsafe condition avoidance process and responsibilities; (b) did not properly implement, use, or enforce its JSA process; (c) did not properly implement, use, or enforce its Hot Work Permit process; and (d) did not reasonably follow industry standards for hoist or winch standards and for keeping workers from under loads. Again, Talos participated in a PIP program and through prior incidents had knowledge of similar issues before this incident.
> 6.5. Talos performed below, far below, and grossly below the industry standard, violated safety regulations or standards; failed to follow industry standards and practice, was not reasonable, and failed to follow its own safety programs or failed to implement proper safety programs.

> 6.6. Based on failing to correct issues documented by BSEE in investigations of 2011 and 2013 incidents on Talos facilities: (a) Talos proceeded with knowledge of such incidents and issues; (b) Talos knew what it was required or expected or had to do to improve safety; (c) Talos did not adequately improve safety; and (d) Talos performed in a fashion that shows conscious disregard as to whether serious injury or death might occur.
> 6.7. The failures of Talos were causes of the incident and resulted in Mr. Jackson being killed.
> . . . .
> 6.12. DLS used the equipment and methods it was allowed to use by Talos. The Talos PIC/UWA signed off on the process and tools and equipment and reportedly did not perform a walk-around (or a proper walk-around) before (or during) the work as required by Talos safety procedures---with conflicting information on some of these issues reviewed by me as of this time.
> 6.13. DLS did not contribute to the problematic and unsafe simultaneous work on multiple levels---the Talos work and platform configuration allowed or required such work---but it only could and only did occur in that fashion because the Talos PIC/UWA signed off on it, allowed it, failed to correct it, and/or did not stop the work.
> 6.14. Mr. Jackson was working where and as allowed or required.
> 6.15. Based on my review to date Mr. Jackson did not contribute to the incident.

Doc. 118, att. 1, pp. 30–32.

Only two of Gee's opinions (2, 3) and a portion of one of Ziegler's conclusions (6.4) rely on BSEE regulations. The court agrees that these standards may impose different and additional duties on platform owners for the operations of lessees compared to those afforded under Louisiana law for independent contractors.[2] However, Talos may still be held liable for DLS's negligence if it "retain[ed] operational control over the contractor's acts or expressly or impliedly authorize[d] those acts." *Coulter v. Texaco, Inc.*, 117 F.3d

---

[2] Under Louisiana law, a principal cannot be held liable for the actions of an independent contractor unless (1) the liability arises from ultrahazardous activities performed by the contractor on the principal's behalf or (2) "the principal retains operational control over the contractor's acts or expressly or impliedly authorizes those acts." *Coulter v. Texaco, Inc.*, 117 F.3d 909, 912 (5th Cir. 1997).

909, 912 (5th Cir. 1997). As set forth in the court's summary judgment ruling, Talos may also be held vicariously liable if it is found that DLS acted more as employee than independent contractor. It is well settled that regulations may provide evidence of the applicable standard of care, even if violation of the regulation does not amount to negligence per se. *Campbell v. Keystone Aerial Survs., Inc.*, 138 F.3d 996, 1003 (5th Cir. 1998). Assuming that plaintiffs lay the proper foundation of Talos's potential liability, then expert testimony as to its compliance with standards of care imposed by federal regulation or industry publication or practice is relevant and helpful to the jury. Again subject to a proper foundation and any necessary jury instructions, the probative value of this evidence is not outweighed by its danger of confusion, unfair prejudice, or misleading the jury.

Talos further argues that the testimony of these experts should be limited because they are "needlessly repetitive and virtually identical." Under Rule 403, relevant evidence may also be excluded when its probative value "is substantially outweighed by a danger of . . . undue delay . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Given the liability issues in this case, Talos fails to meet this high bar. If necessary to streamline the case and complete the trial within the time allotted, the court will divide time over trial week between the parties.

**2. Damages Expert**

Talos also moves to exclude the testimony of Stan Smith, who provided a report for plaintiff Anika Warner on the value of losses caused by Walter Jackson's death to their minor son, Y.J. Smith calculated that Y.J. suffered economic losses for the loss of his father's (1) wages and employee benefits, (2) household and family services, (3) value of

life, and (4) society and relationship. In response to Talos's motion, he withdraws his opinions on the third and fourth category. Talos maintains that the opinions on Categories 1 and 2 should still be excluded, based on assumptions made by Smith.

In particular Talos points to Smith's treatment of Warner, Jackson, and Y.J. as a family unit for the purposes of calculating lost wages and his inclusion of employment benefits therein, though Warner and Y.J. lived in a different state and Jackson provided somewhere between $220 and $500–1,000/month in support to him (while also supporting himself and his spouse, Vantrece Jackson). Talos also criticizes Smith's supposition that Jackson would have continued to work and provide some measure of support to Y.J. until Y.J. was 40 years old, when Louisiana law only provides for support until the age of majority.[3] La. Civ. Code art. 224. Finally, it asserts that Smith's calculation of loss of advice and counsel is improperly high given that Y.J. lived in a separate state from his father, only saw him in person occasionally, and primarily communicated with him over video chat services.

The court finds no evidentiary basis for extending any loss of support award beyond age 18. Accordingly, Smith must limit his calculations under this category of damages. As for the other areas of criticism, these provide excellent fodder for cross-examination. They are also straightforward enough that the jury can use them in determining how much of

---

[3] The duty to educate may continue, thus providing a basis for increasing the award, when the child is (1) a full-time student in good standing at a secondary school, has not attained the age of 19, and is dependent on either parent or (2) has a developmental disability as provided under Louisiana law. La. Civ. Code art. 224. The only case cited by plaintiff in support of calculating this loss beyond 18 years of age extends it to age 22 and thus fails to support Smith's position. *See Rhine v. Bayou Pipe Coating*, 79 So.3d 430 (La. Ct. App. 3d Cir. 2011).

Smith's testimony to credit. They are insufficient, however, to show a basis for exclusion under Rule 702. Accordingly, the motion will be denied.

### III.
#### CONCLUSION

For the foregoing reasons the Motions to Strike [docs. 103, 104, 105, 106] are **DENIED**, subject to the limitation above regarding Stan Smith's testimony and the calculation of loss of support.

**THUS DONE AND SIGNED** in Chambers on this 22nd day of February, 2022.

JAMES D. CAIN, JR.
UNITED STATES DISTRICT JUDGE